ANNA MAE ALLEN, MILLICENT C. BAILEY, DOROTHY IRENE BALL, C. ELIZABETH BROWN, MARJORIE L. BROWN, WILLIE MAE BROWN, D. L. BRYANT, MARY CALLAHAM, SHIRLEY CARRIKER, EDWARD D. CASEY, E. L. CLOANINGER, JR., W. H. DAVIS, ROY T. ELLIS, JR., E. JUNE JOY, H. L. JUSTICE, R. F. KISTLER, PEGGY McCRANIE, E. E. QUEEN, REBECCA SCHOLL, KATHERINE K. SNAVELY, DOLORES SHEETS, LEE L. STICKLEY, ROBERT R. TATUM, MIRIAM P. THOMPSON, AILEEN E. WARNER AND KATHRYN C. WEISNER, FOR THEMSELVES AND IN BEHALF OF ALL OTHER EMPLOYEES OF THE SOUTHERN RAILWAY COMPANY HAVING A COMMON INTEREST IN THE SUBJECT MATTER OF THIS ACTION, PLAINTIFFS, AND BICKETT BASS, MARY B. CROSBY, GEORGE D. ATWELL, HAROLD B. HACKNEY, CELESTIA S. SMITH, CRAVEN SMITH, R. P. POWELL, H. L. NUSSMAN, J. B. NUSSMAN, SR., JOHN W. JORDAN, AND L. J. BYRUM, ADDITIONAL PLAINTIFFS v. SOUTHERN RAILWAY COMPANY, INTERNATIONAL ASSOCIATION OF MACHINISTS, INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS AND HELPERS OF AMERICA, INTERNATIONAL BROTHERHOOD OF BLACKSMITHS, DROP FORGERS AND HELPERS, SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, BROTHERHOOD OF RAILWAY CARMEN OF AMERICA, INTERNATIONAL BROTHERHOOD OF FIREMEN, OILERS, HELPERS, ROUNDHOUSE AND RAILWAY SHOP LABORERS, BROTHERHOOD OF RAILWAY AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYEES, BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES, THE ORDER OF RAILROAD TELEGRAPHERS, BROTHERHOOD OF RAILROAD SIGNALMEN OF AMERICA, NATIONAL ORGANIZATION OF MASTERS, MATES AND PILOTS, NATIONAL

MARINE ENGINEERS BENEFICIAL ASSOCIATION, AMERICAN TRAIN DISPATCHERS ASSOCIATION, RAILROAD YARDMASTERS OF AMERICA AND RAILWAY EMPLOYEES' DEPARTMENT OF THE AMERICAN FEDERATION OF LABOR, DEFENDANTS.

(Filed 25 February, 1959.)

1. **Constitutional Law § 1:   Master and Servant § 2e—**

Decision of the Supreme Court of the United States construing the Union Shop Amendment to the Railway Labor Act (45 USCA sec. 152, Eleventh) controls, and a union shop agreement authorized by the Union Shop Amendment is valid in instances governed by the Federal Act, notwithstanding that otherwise it would be void under our "Right to Work" Act. G.S. 95-78 et seq.

2. **Same: Constitutional Law §§ 17, 23—   Union shop agreement held not unconstitutional in requiring involuntary payment of dues used partly for political purposes.**

This action was instituted by certain non-operating employees of a railroad to restrain the railroad and certain unions from requiring plaintiffs to join the appropriate union and pay the union fees and dues as a condition for the retention of their jobs. Plaintiffs' evidence was to the effect that they were unwilling to join the union and that the fees and dues collected by the unions would be used in part for the support or defeat of political candidates and for the support or defeat of legislation. There was no evidence that the unions had levied or proposed to levy fines or assessments against plaintiffs for the purpose of coercing conformity with the objectives of the unions. *Held:* Under the decision of the Supreme Court of the United States the use of part of the dues by the unions to keep in touch with and make known their findings in respect of legislation tending to promote or impair their collective bargaining position or in respect of candidates for public office, is reasonably related to the unions' activities as collective bargaining representatives, and therefore the requirement that plaintiffs pay such fees and dues does not violate their personal freedom guaranteed by the First Amendment to the Federal Constitution nor deprive them of property in violation of the Fifth Amendment, and nonsuit should have been entered.

PARKER, J., dissenting.

APPEAL by Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees and Brotherhood of Railway Signalmen of America, from *Pless, J.,* and a jury, April 21, 1958, Regular Schedule "B" Civil Term, of MECKLENBURG, docketed and argued as No. 251 at Fall Term, 1958.

The original plaintiffs instituted this action June 8, 1953, against Southern Railway Company, hereafter called Southern, and sixteen railroad labor organizations, hereafter called defendant Unions. After amendment to complaint, referred to below, eleven other individuals,

as permitted by court order, became additional parties plaintiff.

Plaintiffs, non-operating employees of Southern, are not members of, and are unwilling to join, any of defendant Unions.

Plaintiffs alleged that, pursuant to provisions of a contract between Southern and defendant Unions, defendants notified them they would be discharged from their jobs if they did not, by June 15, 1953, join one of defendant Unions and pay to it "fees, dues and assessments"; that the provisions of said contract were "unconscionable and wrongful, contrary to the Constitution, the Common law and the Statutes of the State of North Carolina and violative of the rights of the plaintiffs thereunder"; and plaintiffs prayed that defendants be restrained from their threatened enforcement thereof.

On June 8, 1953, on plaintiffs' *ex parte* application, a temporary restraining order was issued; and on June 17, 1953, after hearing, said restraining order was continued in full force and effect until the trial and final determination of the cause.

Thereafter, separate answers were filed (1) by defendant Unions and (2) by Southern. Defendants admitted their execution of a contract dated February 27, 1953, between Southern and other railroad corporations, referred to therein as "Carrier," and defendant Unions, which provided, *inter alia,* that "all employees of the Carrier . . . shall, as a condition of their continued employment . . . become members of the organization party to this agreement representing their craft or class within sixty (60) calendar days of the date they first perform compensated service as such employees after the effective date of this agreement, and thereafter shall maintain membership in such organization."

Defendant Unions asserted the validity of said contract, their right to enforcement thereof, and prayed that the restraining order be dissolved.

Southern prayed that the court "grant its declaratory judgment as to the validity of the Union Shop Agreement . . . and . . . declare the respective rights, status and other legal relations of the parties . . ." Southern is not a party to this appeal.

On February 1, 1957, (after the *Hudson* and *Hanson* decisions, referred to in the opinion,) plaintiffs, as permitted by court order, filed an amendment to their complaint, in which they alleged, *inter alia,* that the periodic dues, initiation fees and assessments which defendant Unions collect from their members and which, unless protected by the court, plaintiffs would be required to pay in order to retain their jobs with Southern, had been, were and would be regularly and continually used by defendant Unions for the following purposes: (1) to

carry on and finance insurance businesses, banking businesses and sundry other business enterprises which plaintiffs were not willing to finance or support; and (2) to carry on, finance and pay for political activities directly at cross purposes with the free will and choice of plaintiffs, including the election of candidates for public and governmental offices whom plaintiffs oppose and the defeat of other political candidates whom plaintiffs support and the enactment of legislation which plaintiffs oppose and the defeat of other legislation which plaintiffs support. Plaintiffs alleged that such use of their money by defendant Unions would not be germane to collective bargaining and that to compel plaintiffs against their will to pay money to defendant Unions for such purposes would deprive them of their rights under the First, Fifth and Ninth Amendments to the Constitution of the United States.

Thereupon, defendant Unions demurred to the complaint, as amended, on the ground that it did not state facts sufficient to constitute a cause of action. After hearing, the court overruled said demurrer; and, based on the facts alleged in said amendment to complaint, entered a new restraining order which remained in effect until the trial at April, 1958, Term.

Upon trial Judge Pless, at the close of plaintiffs' evidence, entered judgment of nonsuit, dismissing the action as to all defendants except Southern and two of defendant Unions, to wit, Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, hereafter called Brotherhood of Railway Clerks, and Brotherhood of Railway Signalmen of America, hereafter called Brotherhood of Railway Signalmen.

Thirteen plaintiffs testified. By reason of their craft or class, twelve were eligible for membership in the Brotherhood of Railway Clerks and one was eligible for membership in the Brotherhood of Railway Signalmen. Two of the original plaintiffs were no longer employees of Southern. One of the additional plaintiffs, having become a supervisor, was no longer subject to the union shop agreement. There was no evidence as to the employment or craft status of the other twenty-one plaintiffs.

The gist of plaintiffs' testimony was as follows: (1) They were unwilling to join the union; (2) they opposed (compulsory) membership as a condition for retention of their jobs; and (3) they opposed the use by the union of any of their money (a) for the support or defeat of political candidates and (b) for the support or defeat of legislation.

Three plaintiffs (all who were questioned with reference thereto)

testified to their opposition to the use by defendant Unions of any of their money to support or finance an insurance or death benefit program.

None of the plaintiffs testified concerning the use the unions had made and were making of money collected as periodic dues, initiation fees and assessments, from their members. Relevant thereto, plaintiffs offered depositions of officials of the Brotherhood of Railway Clerks and the Brotherhood of Railway Signalmen, adversely examined prior to trial, and documentary evidence.

Motions for judgment of involuntary nonsuit, made, at the close of plaintiffs' evidence and again at the close of all the evidence, by the Brotherhood of Railway Clerks and by the Brotherhood of Railway Signalmen, were overruled.

Six issues were submitted to the jury. The jury found that defendant Unions used "dues and fees" (1) in support of or in opposition to legislation, (2) to influence votes in elections to public office, and (3) to make contributions to the campaigns of candidates for election to public office; and that these uses, and the use of a portion of the "dues and fees" in connection with the death benefit system of the Brotherhood of Railway Clerks, were not reasonably necessary or related to collective bargaining.

Upon the verdict, the following judgment was entered:

"NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that the defendants, and each of them, are hereby restrained and enjoined from placing any compulsion of any nature upon the plaintiffs, individually named as such in the caption of this case, in the course of their employment with the Defendant Railway Company, whereby they, the said plaintiffs, against their free will and choice would be required to join the Defendant Unions, or conform to any rules or disciplines of Defendant Unions, or pay money to said Unions, to wit, the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, and the Brotherhood of Railway Signalmen of America.

"This Order, however, is subject to the following conditions:

"The Defendant Unions shall be permitted, upon proper notice to present proof to the Court, not conflicting or inconsistent with the findings of the jury as hereinbefore recited, as to what portion of the periodic dues, initiation fees and assessments, which they desire to collect from the plaintiffs, will be reasonably necessary and related to collective bargaining between the defendant Un-

ions and the plaintiffs' employer, the Defendant Railway Company, and upon making of such proof, not conflicting or inconsistent with the findings of the jury as hereinabove recited, to the satisfaction of the Court, this Order shall have no application or force or effect with respect to such portion of such periodic dues, initiation fees or assessments or the imposition and collection thereof under the terms of the contract referred to in the pleadings.

"The cause is therefore retained for such further hearings, either with or without a jury, and such further Orders as may seem appropriate should the proof referred to above be offered by the defendants.

"IT IS FURTHER ORDERED that the Defendants pay the costs of this action."

The Brotherhood of Railway Clerks and the Brotherhood of Railway Signalmen excepted and appealed. When used in the opinion, "defendant Unions" refers only to the two appellants.

*Blakeney & Alexander for plaintiffs, appellees.*
*Schoene & Kramer and J. B. Craighill for defendant Unions, appellants.*

BOBBITT, J. Decision depends upon whether the evidence, considered in the light most favorable to plaintiffs, was sufficient to withstand the motion by defendant Unions for judgment of involuntary nonsuit.

Upon adoption of the Railway Labor Act, 20 May, 1926, 44 Stat. 577, Congress "made a fresh start toward the peaceful settlement of labor disputes affecting railroads." *Virginia Ry. Co. v. System Federation No. 40,* 300 U.S. 515, 57 S. Ct. 592, 81 L. ed. 789. This Act, as amended, is now codified as 45 USCA §§ 151 *et seq.* The basic principle underlying this Act is embodied in these provisions: "Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter." 45 USCA § 152, Fourth. In the case cited, the Supreme Court of the United States sustained the constitutionality of the Railway Labor Act, both under the commerce clause and as to the Fifth Amendment, in relation to the requirement that the carrier treat exclusively with the employees' duly chosen bargaining representative.

Defendant Unions, duly chosen as such by the majority, are the exclusive bargaining representatives of *all* employees of the respective crafts or classes to which plaintiffs belong. Under the collective bargaining agreements between defendant Unions and Southern, plaintiffs acquire and have the same rights in respect of seniority, rates of pay, rules, working conditions, etc., under their employment by Southern, as Southern's employees who become and are members of defendant Unions by their free choice.

The validity of the Union shop agreement of February 27, 1953, depends solely upon the authority granted by the Union Shop Amendment to the Railway Labor Act. Act of Congress, January 10, 1951, 64 Stat. 1238, 45 USCA § 152, Eleventh, hereafter called Union Shop Amendment. The agreement contains provisions expressly authorized by the Union Shop Amendment.

Absent the Union Shop Amendment, the union shop agreement would be void under the North Carolina "Right to Work" Act, Session Laws of 1947, Ch. 328, G.S. 95-78 *et seq.*

In *Hudson v. R. R.*, 242 N.C. 650, 89 S.E. 2d 441, *certiorari* denied, 351 U.S. 949, 100 L. ed. 1473, 76 S. Ct. 844, the action was to restrain the carrier and the unions *from entering into* a proposed union shop agreement as permitted, but not required, by the Union Shop Amendment. Plaintiffs therein based their case primarily upon the North Carolina "Right to Work" Act. The constitutional questions now raised were not presented.

In *Hudson,* it was noted that the North Carolina "Right to Work" Act superseded the common law rule approved by this Court in *S. v. Van Pelt,* 136 N.C. 633, 49 S.E. 177, 68 L.R.A. 760, 1 Ann. Cas. 495. The North Carolina "Right to Work" Act was recognized as valid and in full force and effect "except to the extent Congress, in enacting labor legislation related to interstate commerce, has pre-empted the field"; and that the Union Shop Amendment, which relates only to labor relations between carriers and their employees, was in conflict with and superseded the North Carolina "Right to Work" Act. Reference to the opinion will disclose the several questions then considered and discussed.

Prior to *Hudson,* the Supreme Court of Nebraska decided *Hanson v. Union Pacific Railroad Co.,* 160 Neb. 669, 71 N.W. 2d 526, an action to restrain the carrier and the unions from *putting into effect* provisions of union shop agreements containing provisions expressly authorized by the Union Shop Amendment.

For reasons fully set forth by *Justice Wenke,* the Supreme Court of Nebraska held that the enforcement of contract provisions author-

ized by the Union Shop Amendment would deprive plaintiffs of specific constitutional rights, to wit: (1) ". . . the freedom of association, the freedom to join or not to join in association with others for whatever purposes such association is lawfully organized, . . ." guaranteed by the First Amendment; and (2) due process of law, guaranteed by the Fifth Amendment, in that, by requiring an employee who does not desire to join a union to pay initiation fees, dues and assessments, such employee "is required to pay for many things besides the cost of collective bargaining," that is, "all of the varied objects and undertakings in which such labor organizations are or may become engaged." The opinion states: ". . . it is apparent that some of these labor organizations advocate political ideas, support political candidates, and advance national economic concepts which may or may not be of an employee's choice."

In *Hudson,* we expressly reserved the constitutional questions decided by the Supreme Court of Nebraska.

In *Railway Employes' Dept. A. F. L. v. Hanson,* 351 U.S. 225, 100 L. ed. 1112, 76 S. Ct. 714, the United States Supreme Court reversed the Nebraska decision. Plaintiffs, citing *Looper v. Georgia, Southern & Florida Railway Co.,* 213 Ga. 279, 99 S.E. 2d 101, contend the questions now presented were not decided but reserved. Defendant Unions contend the identical questions were considered and decided. If the contention of defendant Unions is correct, the decision of the United States Supreme Court, referred to hereafter as *Hanson,* controls.

*Mr. Justice Douglas,* referring to the decision of the Supreme Court of Nebraska, said: "It held that the union shop agreement violates the First Amendment in that it deprives the employees of their freedom of association and violates the Fifth Amendment in that it requires the members to pay for many things besides the cost of collective bargaining. The Nebraska Supreme Court, therefore, held that there is no valid federal law to supersede the 'right to work' provision of the Nebraska Constitution."

Before considering further what was decided in *Hanson* an analysis of plaintiffs' action seems appropriate.

Plaintiffs have made no tender of dues, initiation fees or assessments. The *Hudson* and *Hanson* decisions determined adversely to plaintiffs the cause of action originally alleged. See *Allen v. Southern Ry. Co.,* 114 F. Supp. 72. All original defendants were restrained by interlocutory orders until February 1, 1957, on the basis of facts originally alleged. Allegations that enforcement of the union shop agreement would deprive them of constitutional rights guaranteed by the First, Fifth and Ninth Amendments were first made in amendment

to complaint filed February 1, 1957; and on the basis of these new allegations all original defendants were restrained by interlocutory order until the trial at April Term, 1958.

Whatever the legal relationship between plaintiffs, a minority of the employees of their respective crafts or classes, and defendant Unions, their duly chosen collective bargaining representatives, such relationship is involuntary on the part of plaintiffs. They do not want defendant Unions to represent them. They do not want to become members of defendant Unions. They do not want to pay any amount as dues, initiation fees or assessments. Finally, if required to pay any amount, they insist that no part thereof shall be used, directly or indirectly, except for purposes reasonably necessary or related to collective bargaining. In short, they are completely at cross-purposes with defendant Unions.

Plaintiffs' cause of action, under amended complaint, proceeds on the premise that if plaintiffs can show that defendant Unions use *any* portion of the dues, initiation fees or assessments, directly or indirectly, for *any* purpose not reasonably necessary and related to collective bargaining, the enforcement of the union shop agreement should be restrained until such time as defendant Unions establish precisely *what* portion of the dues, etc., is used solely for purposes reasonably necessary and related to collective bargaining. The trial proceeded, issues were submitted and judgment entered in accordance with plaintiffs' said premise.

The judgment, based on the jury's findings, restrained the enforcement of the union shop agreement until such time as defendant Unions establish "what portion of the periodic dues, initiation fees and assessments, which they desire to collect from the plaintiffs, will be reasonably necessary and related to collective bargaining between the defendant Unions and the plaintiffs' employer, . . ." At the contemplated further hearing, the determination of what expenditures by defendant Unions are reasonably necessary or related to collective bargaining is not limited to expenditures for uses challenged in the amended complaint.

It is noted that the judgment is determinative only as between named plaintiffs and defendant Unions. If persons hereafter employed by Southern should seek similar relief, their status must be determined in subsequent actions.

Considering the testimony and documents in the light most favorable to plaintiffs, there was evidence tending to establish the facts narrated below.

The Brotherhood of Railway Clerks has in excess of 300,000 mem-

bers in the United States and Canada. Its organizational structure consists of the Grand Lodge, system boards of adjustment and local lodges. The initiation fee, applicable to members of the Charlotte Local Lodge, is $10.00, of which $5.00 is paid to the Grand Lodge; and the dues are $2.25 per month, of which $1.00 per month is paid to the Grand Lodge.

The Brotherhood of Railway Clerks has a North Carolina Legislative Committee composed of a representative from each (North Carolina) local lodge. This committee selects a legislative representative. A local lodge, out of the portion of monthly dues retained by it, pays 10c per month per member to this Legislative Committee. The function and responsibility of the legislative representative is to keep in touch with all North Carolina legislation affecting the interests of the Brotherhood and of its members.

The Grand Lodge of the Brotherhood of Railway Clerks has a full time representative in Washington who observes legislative proceedings of particular interest to the Brotherhood and its members, such as legislation relating to railroad retirement, railroad unemployment insurance, railroad labor relations, and contacts members of Congress with reference thereto.

The Brotherhood of Railway Clerks publishes semi-monthly and distributes to each member an official publication known as "The Railway Clerk." It also publishes monthly "The Grand President's Bulletin" which is distributed to Brotherhood officials. If and when a local lodge or system board of adjustment wishes to subscribe to "Labor," a weekly newspaper referred to below, the Grand Lodge contributes 20c towards the costs of each subscription.

The Brotherhood of Railway Signalmen has approximately 16,000 members. Its organizational structure consists of the Grand Lodge, system general committees and local lodges. The initiation fee is $5.00, of which $1.50 is paid to the Grand Lodge; and the dues are $3.33 per month, of which $1.50 per month is paid to the Grand Lodge.

The Grand Lodge of the Brotherhood of Railway Signalmen sets aside a legislative fund from which it pays legislative representatives in the several states.

The Grand Lodge of the Brotherhood of Railway Signalmen publishes monthly and distributes to its members a publication known as "The Signalmen's Journal." Subscriptions to "Labor" are entered on an individual or subordinate lodge basis. The Grand Lodge contributes no part of the subscription price.

Each of the defendant Unions is one of several owners of the society which publishes "Labor." Presently, this society's revenue con-

sists solely of subscriptions and income from investments. In 1956
and 1957, George M. Harrison, Grand President of the Brotherhood
of Railway Clerks, served on its board of directors. In special edi-
tions of "Labor" published in 1954 and 1956, distributed in areas where
political campaigns were in progress, this newspaper advocated by
name and opposed by name the particular candidates involved. Gen-
erally, this newspaper expresses its views as to candidates and as to
legislation.

There is a voluntary group, composed of the heads of several rail-
way labor unions, known as the Railway Labor Executives Associa-
tion. This group meets ten or twelve times a year "for the purpose of
advancing the mutual organizational interests, in handling common
problems dealing with collective bargaining and such matters as that."
Each of defendant Unions contributes thereto from its Grand Lodge
funds. Occasionally, the Railway Labor Executives Association makes
contributions to Railway Labor's Political League, referred to below.

Railway Labor's Political League is an unincorporated group com-
posed of the chief executive officers of most of the railway labor
unions. It maintains an office in Washington, D. C., staffed by its sec-
retary and one clerical employee. "Generally, the function of it is to
carry on political educational work and to collect voluntary contribu-
tions from railway employees and other citizens to assist in electing
candidates that favor the same general objectives that railroad em-
ployees desire to see accomplished in the Federal Congress." Railway
Labor's Political League makes contributions to support the cam-
paigns of particular candidates and to influence legislation. This par-
ticular group was formed after the 1947 Amendment to the Corrupt
Practices Act.

Each of defendant Unions is a member of the American Federation
of Labor, Congress of Industrial Organizations Federation, hereafter
called AFL-CIO. Harrison is a member of its executive council and
of the governing board of its committee on political education known
as C.O.P.E. AFL-CIO is a voluntary, unincorporated association, com-
posed of "about 138 national and international Unions." "There are
roughly 12½ million members, maybe 13 million, in the Unions that
are affiliated with AFL-CIO." Each of defendant Unions pays sub-
stantial sums from its Grand Lodge funds to the AFL-CIO. In each
instance, the amount so paid is the aggregate of a per capita tax of
so much per member as determined by the AFL-CIO Convention. On
this basis, the amounts so paid by the Brotherhood of Railway Clerks
are quite large. AFL-CIO expends its funds to promote various proj-
ects and causes in which it is interested.

The Grand Lodge of the Brotherhood of Railway Clerks, out of its portion ($5.00) of each initiation fee, allocates 90c to its Death Benefit Department Fund; and out of its portion ($1.00) of the monthly dues, allocates 30c per month to its Death Benefit Department Fund. The Constitution of the Grand Lodge of the Brotherhood of Railway Clerks (Article 27), which is a part of the record herein and was a part of the record before the Supreme Court of the United States in *Hanson*, so provides. Thus, in respect of the portion of dues and fees allocated to the Death Benefit Department Fund, the facts established herein are the identical facts established in *Hanson*.

Referring again to the Constitution of the Grand Lodge of the Brotherhood of Railway Clerks, part of the record in *Hanson*, Article 23 thereof deals generally with the subject of "Legislation," and specifically (Section 1) with the appointment of "National Legislative Counsel," and (Section 3) with the formation of "State or Provincial Legislative Committees." Section 2 provides: "The Grand President in consultation with the grand Executive Council, in absence of Convention action, shall determine the policy of the Brotherhood with respect to Federal Legislation." Section 8 provides: "The State or Provincial Legislative Board shall elect a State or Provincial Legislative Chairman. The Legislative Chairman shall, when authorized by the Legislative Board, devote such time as may be necessary at the State or Provincial Legislatures when same are in session. He shall peruse all bills, memorials and resolutions introduced in the legislature and oppose all legislation detrimental to the welfare of the Brotherhood; he shall have introduced and support such bills and resolutions as advances the welfare of the members of the Brotherhood, subject to the policy of the Brotherhood as designated by the Grand President, and when such policy has been agreed upon, and approved by the Grand President it shall become the State or Provincial legislative program."

The record before the Supreme Court of the United States in *Hanson* includes portions of the constitutions of several other unions which were defendants therein, which contain similar provisions.

The appellees in *Hanson*, in their brief, appear to have drawn into sharp focus the matters now pressed by plaintiffs. Referring to money collected by the defendant Unions as initiation fees and dues, they asserted: "They spend it for political purposes. . . . They spend it to pay for the publication of special editions of 'Labor' to help elect or defeat candidates for the United States Senate, to pay for television programs to help elect Democrats to Congress or to state offices, to pay the salaries and expenses of lobbyists, . . ." Again: "They spend it for life insurance, disability, death or funeral benefits for their

members, which the involuntary member may not want or which he may prefer to take out with a company of his own selection."

What the Supreme Court of the United States decided in *Hanson*, and the import of the language in the opinion of *Mr. Justice Douglas*, must be considered in the light of the record before it and the contentions presented.

In closing the opinion, *Mr. Justice Douglas* said:

"It is argued that compulsory membership will be used to impair freedom of expression. But that problem is not presented by this record. Congress endeavored to safeguard against that possibility by making explicit that no conditions of membership may be imposed except as respects 'periodic dues, initiation fees, and assessments.' (If other conditions are in fact imposed, or if the exaction of dues, initiation fees, or assessments is used as a cover for forcing ideological conformity or other action in contravention of the First Amendment, this judgment will not prejudice the decision in that case.) For we pass narrowly on § 2, Eleventh of the Railway Labor Act. We only hold that the requirement for financial support of the collective-bargaining agency by all who receive the benefits of its work is within the power of Congress under the Commerce Clause and does not violate either the First or the Fifth Amendments. We express no opinion on the use of other conditions to secure or maintain membership in a labor organization operating under a union or closed shop agreement."

Earlier in the opinion, *Mr. Justice Douglas*, while recognizing its power to do so, emphasized that it was for Congress to determine whether authority for union shop agreements should be granted. Thereafter, *Mr. Justice Douglas* said:

"To require, rather than to induce, the beneficiaries of trade unionism to contribute to its costs may not be the wisest course. But Congress might well believe that it would help insure the right to work in and along the arteries of interstate commerce. No more has been attempted here. The only conditions to union membership authorized by § 2, Eleventh of the Railway Labor Act are the payment of 'periodic dues, initiation fees, and assessments.' The assessments that may be lawfully imposed do not include 'fines and penalties.' (The financial support required relates, therefore, to the work of the union in the realm of collective bargaining.) No more precise allocation of union overhead to individual members seems to us to be necessary. The prohibition of 'fines and penalties' precludes the imposition of financial burdens for disciplinary purposes. (If 'assessments' are in fact imposed for purposes not germane to collective bargaining, a different problem would be presented.)"

In the above quotations, we have indicated by parentheses the words relied upon by plaintiffs to support the contention that the Supreme Court of the United States did not pass upon the questions now raised. Whatever our views, if the questions now raised were originally for our decision, we are of opinion and hold that the very questions now raised by plaintiffs were before the Court and decided in *Hanson;* and that the words upon which plaintiffs rely, when read in context, do not support their contention.

In the first quotation, the requirement upheld is "for financial support of the collective-bargaining agency by all who receive the benefits of its work . . ." We do not think this language conveys the idea that the financial support required is limited to such expenditures as the collective bargaining agency incurs while engaged in the negotiation and servicing of collective bargaining agreements. Rather, it indicates that the required financial support embraces all activities of the collective bargaining agency reasonably related to its maintenance as an effective bargaining representative. If our interpretation is correct, it would seem that, in the discharge of its obligations, the collective bargaining agency would be expected to keep in touch with and make known its findings in respect of legislation tending to promote or to impair its collective bargaining position or tending to enhance or defeat the interests of those whom it represents. In so doing, they would do neither more nor less than the representatives of carriers with whom they negotiate collective bargaining agreements.

This sentence appears in the second quotation: "No more precise allocation of union overhead to individual members seems to us to be necessary." We cannot dispel the impression that the meaning of this sentence is that the requirement that unwilling members pay ordinary periodic dues and initiation fees for the support of their collective bargaining agency is a reasonable requirement and that no more precise allocation need be made. In this connection, it is noted that whatever small portion of the periodic dues and initiation fees might be traced, under the accounting practices of defendant Unions, to the uses challenged by plaintiffs, the evidence shows that the Brotherhood of Railway Clerks not only owns an office building but receives over $300,000.00 per year as income from investments. Obviously, no benefit would accrue to plaintiffs if, by a mere change in accounting practices, the income received solely from investments, rather than any portion of the periodic dues and initiation fees, were expended for uses now challenged by plaintiffs.

There is no evidence that plaintiffs will be required to pay "assessments." The jury's findings refer to "dues and fees," not to "assess-

ments." Defendant Unions, for some years, have made no assessments on their members. They make no demand on plaintiffs for the payment of any assessment. Whether plaintiffs would be required to pay an assessment as a condition of continued employment is not presented by this record. If and when either of defendant Unions should undertake to impose an assessment, plaintiff's liability therefor would have to be determined in the light of all facts concerning such assessment.

As we interpret *Hanson,* the Supreme Court of the United States has decided that a requirement that plaintiffs pay the ordinary periodic dues and initiation fees uniformly required of all members does not violate either the First or the Fifth Amendment. Since the constitutionality of the Union Shop Amendment has been expressly upheld, we need not discuss plaintiffs' general attack thereon predicated on the Ninth Amendment.

All that defendant Unions demand of plaintiffs is that they pay the ordinary periodic dues and initiation fees uniformly required of all members. In all other respects, plaintiffs are free to speak and to act according to their own desires even if by so doing they speak and act at cross-purposes with defendant Unions.

As we interpret it, the questions reserved in *Hanson* would arise only if and when defendant Unions should undertake to deny membership or to terminate membership on account of some failure of plaintiffs to comply with the various regulations applicable to voluntary members, e. g., refusal to sign application blanks, failure to attend meetings, failure to speak or act in harmony with the policies and objectives of defendant Unions, failure to pay an exaction imposed by way of penalty or for disciplinary purposes, etc. If defendant Unions, notwithstanding the tender by plaintiffs of ordinary periodic dues and initiation fees, refuse to recognize plaintiffs as members or deny to them any privilege to which a member is entitled, it would seem that by such conduct they would relieve plaintiffs from further obligations under the union shop agreement. It is quite possible that occasions will arise where defendant Unions will prefer to forego the collection of periodic dues and initiation fees rather than have *nonconformists* as members of their organizations.

It is noted that plaintiffs do not allege or contend that defendant Unions made unlawful expenditures in violation of the federal Corrupt Practices Act. USCA, Title 18, § 610; *U. S. v. International Union,* 352 U.S. 567, 1 L. ed. 2d 563, 77 S. Ct. 529, and cases cited. Nor do plaintiffs allege or contend that any expenditure made by defendant

Unions was otherwise than in accordance with the wishes and will of the majority of their members.

As indicated, our decision is based upon our interpretation of what the Supreme Court of the United States decided in *Hanson*. Whether our interpretation or that made in the *Looper* case, *supra,* is correct, will be resolved in due course.

*Pennsylvania R. Co. v. Rychlik,* 352 U.S. 480, 1 L. ed. 2d 480, 77 S. Ct. 421, decided subsequent to *Hanson,* is predicated upon the validity of the Union Shop Amendment. However, it relates to a union shop agreement involving *operating* employees; and, since the questions decided were quite different from those presented in *Hanson* and herein, no discussion of the cited case is appropriate.

This action appears to be an incident in the continuing controversy between those who advocate the principles embodied in the Union Shop Amendment and those who advocate the principles embodied in state "Right to Work" statutes and constitutional provisions. It is plain that the Union Shop Amendment constitutes plaintiffs' basic grievance, not the inconsequential sums they are required to contribute to the support of their collective bargaining representative. Southern's answer herein discloses that it shares the views expressed and pressed by plaintiffs. Suffice to say, we express no opinion as to the merits or demerits of the policy embodied in the Union Shop Amendment.

Under the evidence presented, we conclude that plaintiffs were not entitled to the injunctive relief demanded and that the court erred in overruling the motion by defendant Unions for judgment of involuntary nonsuit.

Reversed.

PARKER, J., dissenting. The first five issues submitted to the jury, and their answers thereto are as follows:

"1. Do the defendant Unions use dues and fees which they collect from railroad employees in support of or opposition to legislation which is not reasonably necessary or related to collective bargaining?

Answer: YES.

"2. Do the defendant Unions use dues and fees which they collect from railroad employees to influence votes in elections to public office?

Answer: YES.

"3. If so, is the same necessary or reasonably related to collective

bargaining?

Answer:  NO.

"4. Do the defendant Unions use dues and fees which they collect from railroad employees to make contributions to the campaigns of candidates for election to public office?

Answer:  YES.

"5. If so, is the same necessary or reasonably related to collective bargaining?

Answer:  NO."

As I read the record, there was sufficient evidence produced by the plaintiffs to carry the case to the jury, and to permit them to answer the issues as they did. According to the jury verdict there is no question but that the defendant unions use dues and fees which they collect from their members to support or to oppose legislation not related to collective bargaining, to influence votes in election to public office, and to make contributions to the campaigns of candidates for election to public office. And according to the provisions of a contract between the Southern Railway Company and the defendant unions, an employee of the Southern Railway Company must join the defendant unions and pay the dues and fees demanded, or be discharged.

The fundamental issue is, can the defendant unions in a free United States, whose supreme national law is set forth in the United States Constitution, force an employee of the Southern Railway to join their unions, and compel him financially to support and contribute to a political party and candidates, whose principles, projects, policies or programs he does not believe in, or may abhor, and does not want, and to contribute to support or oppose legislation not related to collective bargaining regardless of his views, or be discharged from his employment?

The specific and narrow question before us is the use made of the dues and fees demanded by the defendant unions, which plaintiffs must pay or be discharged. I take my stand not upon the so called "right to work" statute of North Carolina, but upon the United States Constitution.

Freedom of association, of thought and of speech is protected by the First Amendment to the United States Constitution against any action by Congress. *American Communications Asso. v. Douds*, 339 U.S. 382, 94 L. ed. 925; *Lincoln Fed. L. U., v. Northwestern I. & M. Co.*, 335 U.S. 525, 93 L. ed. 212, 6 A.L.R. 2d 473; *Thomas v. Collins*, 323 U.S. 516, 89 L. ed. 430.

The right to work is protected by the Fifth Amendment to the United States Constitution. "It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the Amendment to secure." *Truax v. Raich,* 239 U.S. 33, 60 L. ed. 131. "It is said that the right to work, which the Court has frequently included in the concept of 'liberty' within the meaning of the Due Process Clauses (citing authority) may not be denied by Congress." *Railway Employes' Dept. A. F. L. v. Hanson,* 351 U.S. 225, 100 L. ed. 1112.

The Fifth Amendment, which relates to governmental action, federal in character, not to action by private persons, provides that no person shall be deprived of his property without due process of law. *Corrigan v. Buckley,* 271 U.S. 323, 70 L. ed. 969. In my opinion, it is not within the concept of due process to compel a person to contribute dues and fees from his earnings for the purpose of promoting political and ideological ends to which he is opposed and of electing men to public office whose purposes he may distrust, and if he does not so contribute to discharge him from his job with loss of seniority. To hold that this can be done would be a taking of a portion of a person's earnings without due process of law.

In *Railway Employes' Dept. A. F. L. v. Hanson, supra,* the validity of a closed shop contract executed under Section 2, Eleventh of the Railway Labor Act, as amended (64 Stat. 1238) was upheld. However, the Court used this language: "If other conditions are in fact imposed, or if the exaction of dues, initiation fees, or assessments is used as a cover for forcing ideological conformity or other action in contravention of the First Amendment, this judgment will not prejudice the decision in that case." The question reserved is the very question presented here for decision.

In my opinion, no Act of Congress, no governmental action, federal in character, can compel a person to contribute dues and fees from his earnings to a labor union for the ends found by the jury's verdict, so long as the First and Fifth Amendments to the United States Constitution remain a part thereof guarding him from such an unwarranted invasion of his personal and property rights. I am fortified in my opinion by the fact that the Supreme Court of Georgia in *Looper v. Georgia, Southern & Florida Railway Co.,* 213 Ga. 279, 99 S.E. 2d 101, which was decided 10 June 1957, more than a year after the decision in the *Hanson* case, has expressed a similar opinion on substantially similar facts averred in a petition, stating that the question was expressly reserved in the *Hanson* case. If a member of a labor

union desires to make *a voluntary contribution* for such purposes, he is free to do so.

If a political party dominant in the Congress should enact a statute requiring every federal employee to join a union, and compelling each one to contribute from his salary dues and fees to support the ideas, purposes and candidates of that party, and if he did not pay such dues and fees, he should be discharged from his employment, can there be any doubt that the exaction of such dues and fees for such support would be held unconstitutional? A holding to the contrary would destroy constitutional government in this nation.

I vote to uphold the verdict and judgment of the trial court.