BROTHERHOOD OF RAILWAY AND STEAMSHIP
CLERKS, FREIGHT HANDLERS, EXPRESS AND
STATION EMPLOYES ET AL. *v.* ALLEN ET AL.

No. 316.   Argued March 25, 1963.—Decided May 13, 1963.

114

*Milton Kramer* argued the cause for petitioners. With him on the briefs was *Lester P. Schoene.*

*Whiteford S. Blakeney* argued the cause and filed a brief for respondents.

*J. Albert Woll, Theodore J. St. Antoine* and *Thomas E. Harris* filed a brief for the American Federation of Labor and Congress of Industrial Organizations, as *amicus curiae,* urging reversal.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

By the terms of an agreement (the Agreement) authorized by § 2 Eleventh of the Railway Labor Act [1] between

---

[1] Section 2 Eleventh, 45 U. S. C. § 152 Eleventh, provides in part:

"Notwithstanding any other provisions of this chapter, or of any other statute or law of the United States, or Territory thereof, or of any State, any carrier or carriers as defined in this chapter and a labor organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this chapter shall be permitted—

"(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class: *Provided,* That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member or with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership."

the Southern Railway Company and a number of railway labor organizations including the two petitioners herein, employees of Southern are obligated, as a condition of employment, to pay the periodic dues, initiation fees and assessments uniformly required as a condition of acquiring or retaining membership in the union representing their particular class or craft.[2] The individual respondents herein are a number of such employees belonging to classes or crafts represented by petitioners.[3] When the Agreement was adopted respondents were not union members. They refused to pay petitioners any part of the moneys required under the Agreement, instead bringing this action in the Superior Court of Mecklenburg County, North Carolina, to restrain its enforcement.[4] After a

---

[2] Although the Agreement requires employees to become union members within the 60-day period, in fact petitioners do not insist that employees actually join the union, but regard payment of the uniform exactions required by the Agreement as complete compliance therewith.

[3] This action was commenced by 26 such employees but subsequent to the filing of the complaint 11 more were added as plaintiffs by amendment thereto; all 37 are respondents herein. Southern, which was a defendant below but disclaimed interest in the merits of the dispute between the employees and petitioners and did not appeal the Superior Court's judgment, appears in this Court as a respondent. In this opinion, the term "respondents" refers only to the individual respondents, and excludes Southern.

[4] The action was predicated in part on North Carolina's "right to work" law, which makes the union shop unlawful. N. C. Gen. Stats., §§ 95–78 to 95–84; but see Hudson v. Atlantic Coast Line R. Co., 242 N. C. 650, 89 S. E. 2d 441. The complaint sought temporary and permanent injunctive relief on behalf of the named plaintiffs, respondents herein, and all other employees similarly situated, against Southern and every union representing employees of Southern. But the case was nonsuited as to all the defendant unions except petitioners when at trial no proof was offered that any of the plaintiffs belonged to crafts or classes other than those represented by petitioners. Also, the relief granted by the Superior Court in its final judgment was limited to "the plaintiffs, individually named as such in the caption of

trial the Superior Court granted an injunction upon the jury's separate findings that moneys exacted under the Agreement were used by petitioners for purposes not reasonably necessary or related to collective bargaining, namely, (1) to support or oppose legislation, (2) to influence votes in elections for public office, (3) to make campaign contributions in such elections, (4) to support the death-benefits system operated by petitioner Brotherhood of Railway Clerks. The injunction restrained petitioners "from placing any compulsion of any nature upon the [respondents] . . . whereby they . . . against their free will and choice would be required to join the Defendant Unions . . . or pay money to said Unions." It was provided, however, that upon a showing by petitioners of the proportion of expenditures from exacted funds that was reasonably necessary and related to collective bargaining, the injunction would be modified appropriately.

On appeal, the Supreme Court of North Carolina reversed, *Allen* v. *Southern R. Co.,* 249 N. C. 491, 107 S. E. 2d 125, holding that judgment for petitioners was required by our decision in *Railway Employes' Dept.* v. *Hanson,* 351 U. S. 225, where we held that § 2 Eleventh was a valid exercise by Congress of its powers under the

---

this case." This limitation was obviously proper and indeed required, since the instant "action is not a true class action, for there is no attempt to prove the existence of a class of workers who had specifically objected to the exaction of dues for political purposes." *International Assn. of Machinists* v. *Street,* 367 U. S. 740, 774; see p. 119, *infra.*

Upon commencement of the instant action, the plaintiffs obtained an *ex parte* order temporarily restraining enforcement of the union-shop agreement; after hearing, the order was continued in effect *pendente lite,* although it was subsequently modified to be "effective only for the protection of persons who are individually named as parties plaintiff herein or who become added by order of court as such within thirty days from date hereof." Even as modified, such relief was improper. See p. 120, *infra.*

Commerce Clause and did not violate the First Amendment or the Due Process Clause of the Fifth. However, rehearing was granted, and pending decision thereon we decided *International Assn. of Machinists* v. *Street,* 367 U. S. 740. Upon reconsideration of the Superior Court's judgment in the light of that decision, the Supreme Court of North Carolina divided equally, which had the effect of affirming the lower court's judgment. 256 N. C. 700, 124 S. E. 2d 871 (*per curiam*); see *Schoenith* v *Town & Country Realty Co.,* 244 N. C. 601, 94 S. E. 2d 592 (*per curiam*); *Ward* v. *Odell Mfg. Co.,* 126 N. C. 946, 36 S. E. 194. We granted certiorari, 371 U. S. 875, to consider whether the injunction granted by the Superior Court might stand consistently with our decision in *Street.* We reverse and remand for further proceedings not inconsistent with this opinion.

*First.* We held in *Street* "that § 2, Eleventh is to be construed to deny the unions, over an employee's objection, the power to use his exacted funds to support political causes which he opposes." 367 U. S., at 768–769. Respondents' amended complaint alleges that sums exacted under the Agreement "have been and are and will be regularly and continually used by the defendant Unions to carry on, finance and pay for political activities directly at cross-purposes with the free will and choice of the plaintiffs." This allegation sufficiently states a cause of action. It would be impracticable to require a dissenting employee to allege and prove each distinct union political expenditure to which he objects; it is enough that he manifests his opposition to *any* political expenditures by the union.[5] But we made clear in *Street*

---

[5] Respondents testified before any evidence of union political expenditures had been introduced and were asked hypothetical questions such as the following: "If the evidence should show that the money which you might be compelled to pay to the union would be used in part to influence the passage of laws, or to defeat the passage of

that "dissent is not to be presumed—it must affirmatively be made known to the union by the dissenting employee." 367 U. S., at 774.[6]  At trial, only 14 of the respondents testified that they objected to the use of exacted sums for political causes.  No respondent who does not in the course of the further proceedings in this case prove that he objects to such use will be entitled to relief.  This is not and cannot be a class action.  See note 4, *supra.* "The union receiving money exacted from an employee under a union-shop agreement should not in fairness be subjected to sanctions in favor of an employee who makes no complaint of the use of his money for such activities." 367 U. S., at 774.

*Second.*  We also held in *Street* that an injunction relieving dissenting employees of all obligation to pay the moneys due under an agreement authorized by § 2 Eleventh was impermissible.  Such employees "remain obliged, as a condition of continued employment, to make

---

legislation, or to influence the election of certain candidates and defeat the election of other candidates, what is your position with respect to such uses of your money?"  The answer to this particular question was typical of respondents' testimony: "I am opposed to it.  I am opposed to use of my money to influence the passage of laws or effect the election of candidates because I think that as individuals we should have the right to make our own decisions about such matters."  Some plaintiffs, however, testified somewhat more specifically.

In holding respondents' allegations and testimony adequately specific, we are not inconsistent with the plurality opinion in *Lathrop* v. *Donohue,* 367 U. S. 820, 845–846, where it was observed, in concluding that the question of the constitutionality of the integrated bar was not yet ripe for decision, that "[n]owhere are we clearly apprised as to the views of the appellant on any particular legislative issues on which the State Bar has taken a position . . . ."  This observation was made in the context of *constitutional* adjudication, not statutory as here.

[6] Respondents first made known their objection to the petitioners' political expenditures in their complaint filed in this action; however, this was early enough.  *Street,* 367 U. S., at 771.

the payments to their respective unions called for by the agreement. Their . . . grievance stems from the spending of their funds for purposes not authorized by the Act in the face of their objection, not from the enforcement of the union-shop agreement by the mere collection of funds." 367 U. S., at 771. The injunction granted by the Superior Court was thus improper, even though it is subject to modification if petitioners come forward and prove the proportion of exacted funds required for purposes germane to collective bargaining. Even such a remedy, we think, "sweeps too broadly . . . [and] might well interfere with the . . . unions' performance of those functions and duties which the Railway Labor Act places upon them to attain its goal of stability in the industry." *Ibid.*

It also follows from *Street* that the Superior Court erred in granting respondents interim relief against compliance with the financial obligations imposed by the Agreement. As a result of this relief none of the respondents has taken any steps toward compliance since the suit was instituted. We think that lest the important functions of labor organizations under the Railway Labor Act be unduly impaired, dissenting employees (at least in the absence of special circumstances not shown here) can be entitled to no relief until final judgment in their favor is entered. Therefore, on remand respondents should be given a reasonable time within which they must pay to the bargaining representative of their class or craft all sums required under the Agreement, including arrears, that are owing; as to any respondent failing to do this, the action must be dismissed.

*Third.* We suggested in *Street* that among the permissible remedies for dissenting employees were "an injunction against expenditure for political causes opposed by each complaining employee of a sum, from those

moneys to be spent by the union for political purposes, which is so much of the moneys exacted from him as is the proportion of the union's total expenditures made for such political activities to the union's total budget," and restitution of such a sum already exacted from the complainant and expended by the union over his objection. 367 U. S., at 774–775. The necessary predicate for such remedies is a division of the union's political expenditures from those germane to collective bargaining, since only the former, to the extent made from exacted funds of dissenters, are not authorized by § 2 Eleventh. But at trial no evidence was offered by either side, nor was the jury required to make findings, as to the total amount of union expenditures for political purposes, the breakdown of the total union budget according to particular kinds of expenditure, or the proportion of political expenditures in the total union budget of a given period.[7] On remand, in order to frame a decree embodying the suggested remedies, two determinations will have to be made: (1) what expenditures disclosed by the record are political; (2) what percentage of total union expenditures are political expenditures. As to (1) we presently intimate no view, see note 7, *infra*, because here, as in *Street*, see 367 U. S., at 768–770, the courts below made no attempt to draw the boundary between political expenditures and those germane to collective bargaining, and it would be inappropriate for this Court to do so in the first instance and upon the present record. As to (2) the present record is insufficient to enable any calculation.

---

[7] We do conclude, however, without necessarily finding all the questions put to the jury proper for the purpose of distinguishing political expenditures from those germane to collective bargaining, see p. 117, *supra*, or all the answers adequately supported by the evidence, that the verdict, fairly read, constitutes a finding for which there is adequate support in the record that petitioners use a part of the exacted funds in support of political causes.

Since the unions possess the facts and records from which the proportion of political to total union expenditures can reasonably be calculated, basic considerations of fairness compel that they, not the individual employees, bear the burden of proving such proportion. Absolute precision in the calculation of such proportion is not, of course, to be expected or required; we are mindful of the difficult accounting problems that may arise. And no decree would be proper which appeared likely to infringe the unions' right to expend uniform exactions under the union-shop agreement in support of activities germane to collective bargaining and, as well, to expend nondissenters' such exactions in support of political activities.

*Fourth.* While adhering to the principles governing remedy which we announced in *Street,* see 367 U. S., at 771–775, we think it appropriate to suggest, in addition, a practical decree to which each respondent proving his right to relief would be entitled. Such a decree would order (1) the refund to him of a portion of the exacted funds in the same proportion that union political expenditures bear to total union expenditures, and (2) a reduction of future such exactions from him by the same proportion. We recognize that practical difficulties may attend a decree reducing an employee's obligations under the union-shop agreement by a fixed proportion, since the proportion of the union budget devoted to political activities may not be constant. The difficulties in judicially administered relief, although not insurmountable (a decree once entered would of course be modifiable upon a showing of changed circumstances), should, we think, encourage petitioner unions to consider the adoption by their membership of some voluntary plan by which dissenters would be afforded an internal union remedy.

There is precedent for such a plan.[8]  If a union agreed upon a formula for ascertaining the proportion of political expenditures in its budget, and made available a simple procedure for allowing dissenters to be excused from having to pay this proportion of moneys due from them under the union-shop agreement, prolonged and expensive litigation might well be averted.  The instant action, for example, has been before the courts for 10 years and has not yet run its course.  It is a lesson of our national history of industrial relations that resort to litigation to settle the rights of labor organizations and employees very

---

[8] See Trade Union Act of 1913, 2 & 3 Geo. V, c. 30, reenacted by Trade Disputes and Trade Unions Act, 1946, 9 & 10 Geo. VI, c. 52; Comment, 19 U. of Chi. L. Rev. 371, 381–388 (1952); Rothschild, Government Regulation of Trade Unions in Great Britain: II, 38 Col. L. Rev. 1335, 1360–1366 (1938). Pertinent portions of the Act are set out in an Appendix at the end of this opinion. Although the Act is a legislative solution to the problem of dissenters' rights, it might be possible for unions to adopt the substantial equivalent without legislation; we do not mean to suggest, however, that the Act provides a perfect model for a plan that would conform with the discussion in this opinion and in *Street,* nor that all aspects of the English Act are essential, for example the actual segregation of political funds, nor that the particular boundary drawn by the Act between political expenditures and those germane to collective bargaining is necessarily sound. It may be noted that one possible solution to the problem of fluctuating union political expenditures, see p. 122, *supra,* might be adoption by the union of a proportion calculated on the basis not of present political expenditures but projected future such expenditures, so as to anticipate possible fluctuations, with the dissenting employee free to contract out of this proportion of his dues and fees. Alternatively, unions might consider actually fixing a percentage ceiling of political expenditures, from which proportion dissenters could contract out. On the problem of remedies, see generally McAlister, Labor, Liberalism and Majoritarian Democracy, 31 Ford. L. Rev. 661, 687–693 (1963). Cf. Dudra, Approaches to Union Security in Switzerland, Canada, and Colombia, 86 Monthly Lab. Rev. 136 (1963).

often proves unsatisfactory. The courts will not shrink from affording what remedies they may, with due regard for the legitimate interests of all parties; but it is appropriate to remind the parties of the availability of more practical alternatives to litigation for the vindication of the rights and accommodation of interests here involved.

*Reversed and remanded.*

MR. JUSTICE BLACK, while adhering to the views he expressed in *International Assn. of Machinists* v. *Street*, 367 U. S. 740, 780–797, concurs in the judgment and opinion of the Court in this case because he believes both are in accord with the holding and opinion of the Court in the *Street* case.

MR. JUSTICE GOLDBERG took no part in the consideration or decision of this case.

[For opinion of MR. JUSTICE HARLAN, see *post*, p. 129.]

## APPENDIX TO OPINION OF THE COURT.

The Trade Union Act of 1913, 2 & 3 Geo. V, c. 30, reads in part as follows:

3.—(1) The funds of a trade union shall not be applied, either directly or in conjunction with any other trade union, association, or body, or otherwise indirectly, in the furtherance of the political objects to which this section applies (without prejudice to the furtherance of any other political objects), unless the furtherance of those objects has been approved as an object of the union by a resolution for the time being in force passed on a ballot of the members of the union taken in accordance with this Act for the purpose by a majority of the members

voting; and where such a resolution is in force, unless rules, to be approved, whether the union is registered or not, by the Registrar of Friendly Societies, are in force providing—

(a) That any payments in the furtherance of those objects are to be made out of a separate fund (in this Act referred to as the political fund of the union), and for the exemption in accordance with this Act of any member of the union from any obligation to contribute to such a fund if he gives notice in accordance with this Act that he objects to contribute; and

(b) That a member who is exempt from the obligation to contribute to the political fund of the union shall not be excluded from any benefits of the union, or placed in any respect either directly or indirectly under any disability or at any disadvantage as compared with other members of the union (except in relation to the control or management of the political fund) by reason of his being so exempt, and that contribution to the political fund of the union shall not be made a condition for admission to the union.

(2) If any member of a trade union alleges that he is aggrieved by a breach of any rule made in pursuance of this section, he may complain to the Registrar of Friendly Societies, and the Registrar of Friendly Societies, after giving the complainant and any representative of the union an opportunity of being heard, may, if he considers that such a breach has been committed, make such order for remedying the breach as he thinks just under the circumstances; and any such order of the Registrar shall be binding and conclusive on all parties without appeal and shall not be removable into any court of law or restrainable by injunction, and on

being recorded in the county court, may be enforced as if it had been an order of the county court. . . .

(3) The political objects to which this section applies are the expenditure of money—

(a) on the payment of any expenses incurred either directly or indirectly by a candidate or prospective candidate for election to Parliament or to any public office, before, during, or after the election in connexion with his candidature or election; or

(b) on the holding of any meeting or the distribution of any literature or documents in support of any such candidate or prospective candidate; or

(c) on the maintenance of any person who is a member of Parliament or who holds a public office; or

(d) in connection with the registration of electors or the selection of a candidate for Parliament or any public office; or

(e) on the holding of political meetings of any kind, or on the distribution of political literature or political documents of any kind, unless the main purpose of the meetings or of the distribution of the literature or documents is the furtherance of statutory objects within the meaning of this Act.

The expression "public office" in this section means the office of member of any county, county borough, district, or parish council, or board of guardians, or of any public body who have power to raise money, either directly or indirectly, by means of a rate.

(4) A resolution under this section approving political objects as an object of the union shall take effect as if it were a rule of the union and may be rescinded in the same manner and subject to the same provisions as such a rule.

(5) The provisions of this Act as to the application of the funds of a union for political purposes shall app ⸍⸍

to a union which is in whole or in part an association or combination of other unions as if the individual members of the component unions were the members of that union and not the unions; but nothing in this Act shall prevent any such component union from collecting from any of their members who are not exempt on behalf of the association or combination any contributions to the political fund of the association or combination.

4.—(1) A ballot for the purposes of this Act shall be taken in accordance with rules of the union to be approved for the purpose, whether the union is registered or not, by the Registrar of Friendly Societies, but the Registrar of Friendly Societies shall not approve any such rules unless he is satisfied that every member has an equal right, and, if reasonably possible, a fair opportunity of voting, and that the secrecy of the ballot is properly secured.

(2) If the Registrar of Friendly Societies is satisfied, and certifies, that rules for the purpose of a ballot under this Act or rules made for other purposes of this Act which require approval by the Registrar, have been approved by a majority of members of a trade union, whether registered or not, voting for the purpose, or by a majority of delegates of such a trade union voting at a meeting called for the purpose, those rules shall have effect as rules of the union, notwithstanding that the provisions of the rules of the union as to the alteration of rules or the making of new rules have not been complied with.

5.—(1) A member of a trade union may at any time give notice, in the form set out in the Schedule to this Act or in a form to the like effect, that he objects to contribute to the political fund of the union, and, on the adoption of a resolution of the union approving the furtherance of political objects as an object of the union, notice shall be given to the members of the union ac-

quainting them that each member has a right to be exempt from contributing to the political fund of the union, and that a form of exemption notice can be obtained by or on behalf of a member either by application at or by post from the head office or any branch office of the union or the office of the Registrar of Friendly Societies.

Any such notice to members of the union shall be given in accordance with rules of the union approved for the purpose by the Registrar of Friendly Societies, having regard in each case to the existing practice and to the character of the union.

(2) On giving notice in accordance with this Act of his objection to contribute, a member of the union shall be exempt, so long as his notice is not withdrawn, from contributing to the political fund of the union as from the first day of January next after the notice is given, or, in the case of a notice given within one month after the notice given to members under this section on the adoption of a resolution approving the furtherance of political objects, as from the date on which the member's notice is given.

6. Effect may be given to the exemption of members to contribute to the political fund of a union either by a separate levy of contributions to that fund from the members of the union who are not exempt, and in that case the rules shall provide that no moneys of the union other than the amount raised by such separate levy shall be carried to that fund, or by relieving any members who are exempt from the payment of the whole or any part of any periodical contributions required from the members of the union towards the expenses of the union, and in that case the rules shall provide that the relief shall be given as far as possible to all members who are exempt on the occasion of the same periodical payment and for enabling each member of the union to know as respects

any such periodical contribution, what portion, if any, of the sum payable by him is a contribution to the political fund of the union.

## SCHEDULE.

FORM OF EXEMPTION NOTICE.

Name of Trade Union

POLITICAL FUND (EXEMPTION NOTICE).

I hereby give notice that I object to contribute to the Political Fund of the                               Union, and am in consequence exempt, in manner provided by the Trade Union Act, 1913, from contributing to that fund.

A. B.
Address

day of          19

MR. JUSTICE HARLAN, concurring in part and dissenting in part.

I agree with the reversal of the interim and qualified permanent relief that was granted by the state courts respecting the obligation to pay union dues. But I disagree with what in effect amounts to an affirmance of the state judgment in other respects. I believe that dismissal of this action in its entirety is called for.

*International Assn. of Machinists v. Street,* 367 U. S. 740, decided only two years ago, stated in unmistakable terms that a plaintiff claiming relief in an action of this kind must show two things: (1) that he had made known

to the union the *particular* political candidates or causes for whose support he did not wish his union dues used; (2) that membership dues had been used for such purposes.

The statement of these principles was reinforced on the very same day in *Lathrop* v. *Donohue,* 367 U. S. 820, the Wisconsin integrated bar case, where a plurality of the Court said (at 845–846):

> "Even if the demurrer is taken as admitting all the factual allegations of the complaint, even if these allegations are construed most expansively, and even if, like the Wisconsin Supreme Court, we take judicial notice of the political activities of the State Bar, still we think that the issue of impingement upon rights of free speech through the use of exacted dues is no more concretely presented for adjudication than it was in *Hanson* [351 U. S. 225]. Compare *International Association of Machinists* v. *Street, ante,* p. 740, at pp. 747–749. Nowhere are we clearly apprised as to the views of the appellant on any particular legislative issues on which the State Bar has taken a position, or as to the way in which and the degree to which funds compulsorily exacted from its members are used to support the organization's political activities." See also what follows at pp. 846–848.

These requirements have not been met in this case. At best all that has been alleged or proved is that the union *will* expend a part of each respondent's still-unpaid membership dues for so-called political or other purposes not connected with collective bargaining, and that each respondent would object to the use of any part of his dues for matters other than those relating to collective bargaining. None of the respondents who testified could specify any *particular* expenditure, or even class of expenditure, to which he objected.

I do not understand how, consistently with *Street*, the Court can now hold that "it is enough that . . . [a union member] manifests his opposition to *any* political expenditures by the union" (*ante*, p. 118), or how it can say that in so holding "we are not inconsistent with" what the plurality was at such pains to point out in *Lathrop* (albeit in a constitutional context), *id.*, note 5. The truth of the matter is that the Court has departed from the strict substantive limitations of *Street* and has given them (and, as I see it, also that case's remedial limitations, compare 367 U. S., at 772–775, 778–779, 779–780, 796–797, with *ante*, p. 122–123 and Appendix) an expansive thrust which can hardly fail to increase the volume of this sort of litigation in the future.

Believing that our decisions should have more lasting power than has been accorded *Street,* I must respectfully dissent. I would reverse the judgment and remand the case for dismissal of the complaint.