Kenneth ABRAMS, et al., Plaintiffs,

v.

**COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO,**
**Defendant.**

Civ. A. No. 87–2816 (RCL).

United States District Court,
District of Columbia.

April 16, 1993.

Hugh L. Reilly, National Right to Work Legal Defense Foundation, Inc., Springfield, VA, for plaintiffs.

James B. Coppess, Communications Workers of America (Michael Leibig, of counsel), Zwerdling, Paul, Leibig, Kahn & Thompson, Washington, DC, for defendant.

## ORDER AND JUDGMENT

LAMBERTH, District Judge.

This case comes before the court on plaintiffs and defendant's cross motions for summary judgment. For the reasons stated in the Memorandum Opinion issued this date, it is hereby ORDERED that:

1. Plaintiffs' Motion for Summary Judgment is GRANTED in part and DENIED in part. The court GRANTS plaintiffs' motion only as to its claim that CWA's arbitration policy violates CWA's duty of fair representation toward plaintiffs. The court DENIES plaintiffs' motion in all other respects.

2. Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part. The court GRANTS defendant's motion in all respects except as to CWA's arbitration policy. In that respect, the court DENIES defendant's motion. Except as to the arbitration provision, CWA's Policy on Agency Fee Objections does not violate CWA's fair duty of representation to plaintiffs.

3. Judgment is hereby ENTERED enjoining defendants and its agents from requiring plaintiffs to submit agency fee disputes to arbitration. In all other respects, judgment is hereby ENTERED for defendant, DISMISSING WITH PREJUDICE all other claims raised by plaintiffs herein.

SO ORDERED.

## MEMORANDUM OPINION

This case comes before the court on plaintiffs and defendant's cross motions for summary judgment. The court grants each motion in part and denies each in part.

This case originally came before the court on plaintiffs' motion for a preliminary injunction based on their constitutional and statutory claims, and defendant's motion to dismiss those two claims. In a Memorandum Opinion and accompanying Order dated October 25, 1988, the court dismissed plaintiffs' constitutional claim and denied plaintiffs' motion for a preliminary injunction. 702 F.Supp. 920 (D.D.C.1988). Reconsideration was denied in an Opinion dated November 7, 1988. 702 F.Supp. at 925. On July 13, 1989, the Court of Appeals for the District of Columbia Circuit affirmed this court's denial of preliminary relief, for the reasons stated by this court in its October 25 and November 7, 1988 Opinions. *See Abrams v. Communications Workers of America*, 884 F.2d 628 (D.C.Cir. 1989). Since that time, the parties have engaged in discovery. Discovery is now complete and each side has moved for summary judgment on plaintiffs' remaining statutory claim.[1]

## I. *FACTS*.

The facts of this case are long and complicated. They are, however, not in dispute.[2] All the court must determine is whether the facts as stated demonstrate that CWA has violated its statutory duty of fair representation toward plaintiffs. That analysis will in turn determine the appropriateness of summary judgment for either plaintiffs or defendant.

The named plaintiffs are four employees of private telephone companies who pay agency fees to the defendant, Communication Work-

---

[1]. Defendant filed the initial motion for summary judgment before discovery was complete. The court then granted to plaintiffs a continuance for responding to the summary judgment motion until the completion of discovery. *See* 3/3/92 Order. After discovery ended, defendant, with the approval of plaintiffs and the court, filed a supplemental memorandum in support of its motion so as to bring events up to date before the plaintiffs filed their opposition. Accordingly, the court will refer to the parties briefs as Defendant's Motion, Defendant's Supplement, Plaintiffs' Motion (which includes plaintiffs' opposition to defendant's motion), Defendant's Reply (which includes defendant's opposition to plaintiffs' motion), and Plaintiffs' Reply.

[2]. In plaintiffs' statement of material facts not in dispute, plaintiffs do characterize some facts as being disputed. For example, plaintiffs contend that CWA does not properly define what "collective bargaining" activities are. Plaintiffs' Motion, Plaintiffs' Response to Defendant's Statement of Material Facts Not In Dispute at ¶3. Plaintiffs do not challenge what CWA calls collective bargaining activities, only whether that categorization is appropriate. Whether CWA's definition of collective bargaining activities is appropriate is a legal issue to be decided by applying the duty of fair representation standards. This is not a dispute as to fact.

ers of America ("CWA"), as a condition of employment pursuant to collective bargaining agreements between their employers and CWA. The plaintiffs are not members of the union, nor do they wish to become union members. Nevertheless, plaintiffs must pay to the CWA fees equivalent to those paid by union members. Plaintiffs do not contest their legal obligation to pay fees to the CWA. This dispute centers on the amount of fees they must pay.

Plaintiffs must pay fees to the CWA because of two provisions in the National Labor Relations Act. Under section 9(a) of the National Labor Relations Act, the bargaining unit employees in plaintiffs' work places may choose a particular union to be those employees' exclusive collective bargaining representative. 29 U.S.C. § 159(a). In this case, the chosen union is the defendant, CWA. Under section 8(a)(3) of the Act, plaintiffs' employers can require its bargaining unit employees to become members of the selected union, CWA, or at least pay dues equal to those of members as a condition of employment. 29 U.S.C. § 158(a)(3). Plaintiffs' collective bargaining agreement imposes the latter requirement. Article 4, Section 1 requires all employees to "pay or tender to the Union amounts equal to the periodic dues applicable to members." Plaintiffs' Motion, Attachment 1, General Agreement between CWA and [plaintiffs' employers] at 26.

These provisions require that plaintiffs, as bargaining unit members, pay the equivalent of membership dues to the CWA, because the CWA is their chosen and exclusive bargaining representative. Plaintiffs must do so regardless of their opinion of the CWA and unionism in general.

Because these provisions can have the effect of forcing individuals to support union activities against their will, the Supreme Court has whittled down the dues that must be paid by employees who choose not to become union members. The Supreme Court has concluded that nonmember em-

ployees like plaintiffs must only pay that proportion of membership dues attributable to those union activities "germane to collective bargaining, contract administration, and grievance adjustment." *Communications Workers v. Beck,* 487 U.S. 735, 745, 108 S.Ct. 2641, 2648–49, 101 L.Ed.2d 634 (1988). The rationale behind this rule is straightforward: if employees choose not to become union members, they should have to support only those union activities that they by law have to accept, i.e. collective bargaining and related activities. This rule ensures that nonmember employees pay for the collective bargaining benefits they receive, but it also exempts them from having to finance political or otherwise nonessential union activities with which they might disagree.

CWA has established a procedure for accommodating nonmember employees, like plaintiffs, who object to paying dues for expenditures unrelated to collective bargaining. That procedure allows a nonmember employee to opt-out of paying for non-collective bargaining activities. That procedure also allows the dissenting employee to challenge the CWA's determination of what activities are related to collective bargaining and thus chargeable to nonmember fee payers. The mechanics of this policy are quite intricate and are listed here in full.[3]

The CWA Policy on Agency Fee Objection provides that "[t]he agency fee payable by objectors will be based on the Union's expenditures for those activities or projects normally or reasonably undertaken by the Union to advance the employment-related interest of the employees it represents." Defendant's Exh. A. Among those expenditures CWA treats as "chargeable" to objectors are those going for *negotiations with employers,* enforcing collective bargaining agreements, informal meetings with employer representatives, discussion of work related issues with employees, handling employees' work-related problems, union administration, and litigation costs.[4] CWA provides a detailed list of

---

3. The parties have stipulated that the CWA's policy as of 1988 provides the basis for the resolution of this case. Plaintiffs' Motion at 19 n. 56.

4. Starting in the 1991–1992 fee year, the CWA eliminated from the list of chargeable activities

all lobbying costs; public relations and community service activities; and the costs of litigation when the litigation is not related to collective bargaining, the defense of the union against charges of unfair representation, or the union's

"chargeable" and "nonchargeable" expenditures to each objector. *See* Defendants Exhs. G and U (original and updated lists).

CWA notifies non-union member employees of their right to file objections through a notice that is published each year in the March issue of the *CWA News* which is then sent to all employees. CWA also sends a copy of this notice to any employee who makes an inquiry concerning the union's policy. Defendant's Motion, Brackens Decl. at ¶¶ 2, 12. The notice defines in general terms the sorts of expenditures that nonmembers may opt out of financing and also cites examples of "chargeable" and "nonchargeable" expenditures. Defendant's Exh. B (Policy Statement). The notice also reports that CWA's experience over the past seven years has been that "chargeable" expenditures make up about 80–85% of total union expenditures, while "nonchargeable" expenditures make up about 15–20% of the total. *Id.* Finally, the notice explains the method for filing an objection, and the rights that the CWA accords to those who do so. *Id.*

The CWA's fiscal year runs from January 1 through December 31. The CWA policy provides for a fee year that runs from July 1 through June 30. This fee year allows the advance reduction, *see infra*, of objectors' fees to be based on audited expenditures from the most recently completed fiscal year. The policy calls for objections to be made during the month of May, so that the CWA will have thirty days in which to arrange for the payment of the advance reduction. In practice, however, the CWA accepts objections anytime after the publication of the policy notice in the March *CWA News* through the second week of June. Objections filed out of time are accepted if the employee has a reasonable excuse, e.g. mid-year employment. If the objector files his/her objection out of time and has no excuse, the CWA does not accept the objection and sends a letter to that employee explaining when objections should be filed. Brackens Decl. at ¶ 4.

When CWA receives an objection, it reduces the fees of the objecting employee by the percentage of national union expenditures categorized as *non* chargeable for the most recent fiscal year. CWA uses national union expenditures as a benchmark instead of local union expenditures because on average national union expenditures for chargeable activities are lower than those on the local level. This approach also allows CWA to process objections quickly, without having to calculate each objector's local union's *non* chargeable expenses.[5]

CWA uses an accounting firm to actually compute the percentage of union fees chargeable to objectors. The firm bases its calculation on its annual audit of CWA expenditures and produces a special report detailing the chargeable and nonchargeable expenses. Defendant's Motion, Beans Decl. at ¶ 2; Exh. H. The accounting firm allocates the expenditures relating to CWA's officers and staff on the basis of a time sampling study done each year by the statistical firm of Westat, Inc. Defendant's Exhs. J and M. The accounting firm's calculation is based on a format designed by the late Dr. Emmanuel Saxe, the former Dean of the Bernard M. Baruch School of Business and Public Administration, City University of New York. Beans Decl. ¶ 2. The firm's reports are reviewed by Dr. Martin Benis, Professor of Accounting at Baruch College, to insure that the method suggested by Dr. Saxe is followed. *Id.*

Since 1988, CWA has reduced each objector's fees by giving them at the beginning of the fee year an "advance reduction" pay-

associational existence. Defendant's Supplement at 3.

5. Since February 1989, CWA has included in its explanation of the fee reduction given to objectors a chart demonstrating that the chargeable percentages of local expenditures are generally higher than the chargeable percentages of national union expenditures. Defendant's Supplement at 5, Exh. U. Beginning with the 1992–93 fee year, CWA began to provide each objector

with an allocation of expenditures by the local with jurisdiction over the objector's work site, in addition to the allocation of national union expenditures. Brackens Decl. ¶ 24. CWA agreed to do so because of a settlement agreement between CWA and the NLRB. *Id.* CWA will continue to base its fee reductions on national expenditures, unless the local allocation indicates that a greater fee reduction is due. *Id.*

ment. That advance reduction payment is equal to the fee that the employee will pay, if he or she remains in the bargaining unit during the entire year, multiplied by the percentage of national union expenditures for *non* chargeable activities during the most recent fiscal year. Brackens Decl. at ¶ 6. The *advance reduction* then equals the amount of the year's full fee that is not chargeable to objectors. The CWA then charges the objecting employee the full fee during the year (through payroll deductions) and allows the employee to subsidize him/herself with the advance reduction payment already received. In the end, the objector has paid only for chargeable activities, although the employee had to pay the entire fee during the year.[6]

CWA sends a letter from the union's secretary-treasurer with the advance reduction check. The letter explains the calculation of the fee reduction, the method by which that calculation may be challenged before an independent arbitrator, and the rights of employees making such a challenge. Brackens Decl. at ¶ 7; Defendant's Exh. E (sample letter). Attached to that letter is a detailed list of examples of "chargeable" and "nonchargeable" expenditures, taken from CWA's actual practice in allocating expenditures, so that the fee payer will be able to determine whether he or she disagrees with the union's allocation of those expenditures. Defendant's Exh. G. Also attached to the letter is a detailed report by CWA's accountants showing the actual allocation of union expenditures to the chargeable and nonchargeable categories. Defendant's Exh. K. This report explains the methods used for allocating different sorts of expenditures. *Id.*

If an objecting employee wishes to challenge the amount of the advance reduction, he or she must write a letter to that effect within thirty days of receiving the advance reduction check. CWA Policy then requires the referral of the matter to arbitration. The American Arbitration Association appoints an independent arbitrator and CWA bears the burden of proving to that arbitra-

tor the validity of its calculation. The fee payer need not specify the nature of his or her objection, and need not actually participate in the proceedings before the arbitrator. CWA policy also specifies that the arbitration proceedings be conducted in accordance with the AAA Rules for the Impartial Determination of Union Fees. Defendant's Exh. P. The arbitrator's rule is final and binding upon the union. While challenges are pending, CWA holds forty percent of the fees paid by those objectors making the challenge in an interest-bearing escrow account. Brackens Decl. at ¶ 8.

Plaintiffs' complaint challenges this procedure on First Amendment and statutory grounds. The court already has dismissed plaintiffs' First Amendment claim because no state action is present. *See* 10/25/88 Memorandum Opinion and accompanying Order. All that remains is plaintiffs' contention that the CWA procedure violates CWA's fiduciary duty to fairly represent plaintiffs.

In their Complaint, plaintiffs contend that this procedure violates CWA's duty of fair representation because it: (1) uses the advance reduction method instead of reducing each plaintiff's payment on a pro rata basis, (2) does not require the demonstration that each chargeable activity works to the "actual benefit" of objectors, (3) requires yearly objections during a limited window period, (4) employs an overly broad definition of chargeable activities, (5) fails to advise non-union members of chargeable costs on a timely basis, and (6) uses an accounting method for determining chargeable costs that is unreliable and inaccurate.

In plaintiffs' motion for summary judgment, plaintiffs reduce these arguments down to three. They contend that: (1) CWA's definition of chargeable expenses is too broad, (2) CWA's computation of chargeable costs is inadequate, and (3) CWA's mandated use of arbitration to resolve fee disputes is unlawful. Plaintiffs' Motion at 2.

---

6. CWA uses this system instead of reducing each of the objector's payments during the fee year. The advance reduction avoids a myriad of administrative problems that could result from having to calculate and then deduct the appropriate amounts from each objector's pay check. The advance reduction method allows CWA to bill all employees in the same manner. Brackens Decl. at ¶ 5.

The court first will address the legal standards that govern a union's duty of fair representation and summary judgment on such a claim. The court then will address each of plaintiffs' allegations in turn. This court's opinion will focus on those specific allegations made by plaintiffs and use those allegations as a framework for its discussion.

## II. *DUTY OF FAIR REPRESENTATION.*

■ CWA's duty of fair representation is a duty that is judicially implied from its statutory duty—under 29 U.S.C. §§ 158(a)(3), 159—to represent all bargaining unit employees of a particular employer. *See Steele v. Louisville & Nashville R. Co.* 323 U.S. 192, 202, 65 S.Ct. 226, 232, 89 L.Ed. 173 (1944). This duty requires a union to "represent fairly the interests of all bargaining-unit members during the negotiation, administration, and enforcement of collective bargaining agreements." *International Bhd. of Elec. Workers v. Foust,* 442 U.S. 42, 47, 99 S.Ct. 2121, 2125, 60 L.Ed.2d 698 (1979).

■ A breach of a union's duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916–17, 17 L.Ed.2d 842 (1967); *Price v. Int'l Union, UAW,* 927 F.2d 88, 92 (2d Cir.1991). This standard applies to a union's contract administration, enforcement, and negotiation, as well as any other instances where a union acts in a representative role. *Air Line Pilots v. O'Neill,* 499 U.S. 65, ——, 111 S.Ct. 1127, 1135, 113 L.Ed.2d 51 (1991). Under this standard, the court's review of CWA's actions must be highly deferential. *Id.* The court can find a breach of this duty only if CWA's actions "can be fairly characterized as so far outside a 'wide range of reasonableness,' . . . that [those actions] are wholly 'irrational' or 'arbitrary.' " *Id.* (citation omitted).

■ Plaintiffs contend that heightened review applies in cases where a union exacts funds from nonmember employees. Plaintiffs argue that under the case of *Chicago Teachers Union v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), CWA must not only meet the *Vaca* standard but also additional constitutional standards. *Hudson* imposes specific requirements on a union's procedure for exacting fees from nonmembers and does not rely on the deferential review standard of *Vaca.* The court concludes that *Hudson* does not apply to this case.

In *Hudson,* the Supreme Court applied a higher, constitutional standard of scrutiny to the procedures that the union there used to exact funds from nonmembers, but the Supreme Court did so because the employees involved worked in the public sector. The union involved was the Chicago Teachers Union, and it had the approval of the Chicago Board of Education to be the exclusive collective bargaining agent for the Board's educational employees. *Hudson,* 475 U.S. at 294, 106 S.Ct. at 1069. As this court already has concluded, no such state action exists in this case. 702 F.Supp. at 921–23. In the absence of state action, the court has no basis for imposing *Hudson*'s heightened constitutional review.

Plaintiff insists that the duty of fair representation has constitutional dimensions which nevertheless require the application of the *Hudson* requirements to this case. None of the four reasons plaintiffs give for this position justify the application of heightened scrutiny.

First, plaintiffs argue that the duty of fair representation is itself constitutionally based and thus deserving of *Hudson*'s scrutiny. Plaintiffs' Motion at 12–13. For this position plaintiffs rely on the statement in *Vaca* that the duty of fair representation is "at least as exacting a duty . . . as the Constitution imposes upon a legislature to give equal protection to the interests of those for who it legislates." *Vaca,* 386 U.S. at 202, 87 S.Ct. at 923. This statement hardly overcomes *Vaca*'s ultimate holding that the tripartite standard governs the review of CWA's procedure.

Second, plaintiffs argue that CWA's duty of fair representation exists because CWA is a fiduciary to its nonmember payers. Plaintiffs continue that the *Hudson* standards track those that a fiduciary normally owes. Therefore, plaintiffs claim that CWA's obli-

gations need to be reviewed by the *Hudson* standards. Plaintiffs' attenuated syllogism does not compel this result. The court concludes that the *Vaca* standard adequately accounts for the fiduciary status of unions and still governs this court's review of CWA's procedure.

Third, plaintiffs contend that the *Hudson* requirements were not based just upon First Amendment concerns but also basic considerations of fairness, considerations that also are present in this case. In *Hudson,* the Supreme Court did state that "[b]asic considerations of fairness, as well as concern for the First Amendment rights at stake, also dictate that the potential objectors be given sufficient information to gauge the propriety of the union's fee." *Hudson,* 475 U.S. at 306, 106 S.Ct. at 1075–76. This statement supports only the requirement that "objectors be given sufficient information to gauge the propriety of the union's fee," and not the other requirements of *Hudson.* As will be seen below, even if this standard is applicable, it is met here because the CWA procedure provides this information.

Finally, plaintiffs contend that because both *Hudson* and *Beck,* the latter of which gave rise to plaintiffs' claim here, relied in part on the case of *International Ass'n of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), this court must somehow read into *Beck's* holding the strictures of *Hudson.* Two cases' reliance on the same precedent for the support of their conclusions hardly justifies the wholesale incorporation of each case's holding into the other's. This is especially true here where *Beck* never refers to or relies upon the *Hudson* case.

Plaintiffs' four arguments are contrary to Supreme Court precedent. The duty of fair representation allows a wide range of reasonableness. *O'Neill,* 499 U.S. at ——, 111 S.Ct. at 1130. Such a reasonableness standard is not equivalent to "the stringent tests applied in the First Amendment context." *United Steelworkers of America v. Sadlow-*

*ski,* 457 U.S. 102, 111, 102 S.Ct. 2339, 2345, 72 L.Ed.2d 707 (1982).[7]

■ Because there are no facts in dispute, the court will grant summary judgment on the issues presented based on whether CWA's procedure is "arbitrary, discriminatory, or in bad faith." That test governs fair duty of representation cases, and CWA's ability to meet that test will also determine whether it or plaintiffs are entitled to judgment as a matter of law under Fed.R.Civ.P. 56(c).

The court turns to each of plaintiffs three main arguments in order. The court finds that only the CWA's arbitration requirement violates CWA's duty of fair representation toward its nonmember fee payers. Otherwise CWA's policy satisfies its duty of fair representation and CWA is entitled to summary judgment as to that policy's remaining portions.

### III. CWA'S DEFINITION OF CHARGEABLE EXPENSES.

Plaintiffs challenge numerous aspects of CWA's procedure under its argument that CWA misdefines what its "chargeable expenses" are. Plaintiffs, in effect, throw out a myriad of arguments in the hope that one of them sticks. Plaintiffs' wide-ranging arguments contend that: (1) *Beck* prevents CWA from even *collecting* any funds that could go to nonchargeable expenditures (an attack on the advance reduction as opposed to the *pro rata* reduction method), (2) CWA wrongfully includes within its chargeable expenses category noncharseable expenses under *Beck,* (3) CWA wrongfully refuses to provide nonmembers information about the propriety of their fee until those nonmembers object, (4) CWA wrongfully requires nonmembers to repeat their objection every year within a limited window period, and (5) CWA fails to demonstrate that the chargeable expenditures "actually benefit" the nonmember fee payers. None of these arguments demonstrate that CWA's procedure violates its duty of fair representation.

---

**7.** The Supreme Court precedents on this issue also defeat plaintiffs' argument that the standard governing CWA's actions is whether CWA's actions are *ultra vires* or constitute a *per se* viola-

tion. The authorities plaintiffs support for these two alternative theories do not rebut the language of these cases.

### A. CWA's Collection of Fees.

■ First, plaintiffs contend that language in the *Beck* opinion forbids CWA's *collection,* as opposed to the actual use, of any fees other than those needed for chargeable expenses. That is, plaintiffs contend that CWA's *collection* of full fees from nonmembers violates *Beck* even though CWA gives those nonmembers an advance reduction at the beginning of the year. For this position, plaintiffs rely on the statement in *Beck* that "Congress understood § 8(a)(3) to afford nonmembers adequate protection by authorizing the *collection* of only those fees necessary to finance collective bargaining activities...." *Beck,* 487 U.S. at 759, 108 S.Ct. at 2655–56 (emphasis added). Plaintiffs' position fails to read *Beck* in its own context as well as in the context of other Supreme Court precedents.

Throughout the *Beck* opinion, the Supreme Court phrases the issue before it as one of whether the CWA could "over the objections of nonmembers, [ ] *expend* compelled agency fees on political causes." 487 U.S. at 745, 108 S.Ct. at 2648–49 (emphasis added); *see also* 487 U.S. at 738, 108 S.Ct. at 2643–44 (same language). The expenditure of mandated fees on nonchargeable expenses rather than the collection of those fees is what *Beck* and its predecessors cautioned against. That is why in *Machinists v. Street,* 367 U.S. 740, 774, 81 S.Ct. 1784, 1802–03, 6 L.Ed.2d 1141 (1961), which decided the *Beck* issue under the Railway Labor Act, the Court fashioned remedies that focused on the *expenditure* of collected funds. The two remedies proposed in *Street* are an injunction against the expenditure toward nonchargeable activities of nonmember fees, and an advance reduction system. *Street,* 367 U.S. at 774–775, 81 S.Ct. at 1802–03. The Supreme Court proposed those remedies because it perceived the harm at issue to be the actual use of nonmember fees for nonchargeable expenses, not their collection.

Plaintiffs could argue that the collection of full fees imposes an additional injury upon nonmembers over and above that which would be inflicted through the expenditure of those funds on nonchargeable activities. But, even if this were true, any harm that could accrue solely from the collection of fees for nonchargeable expenses is mediated here because CWA provides plaintiffs with an advance refund of those fees. This court follows the direction of the Supreme Court and finds that CWA does not abuse its duty of fair representation to plaintiffs by collecting full fees from them, provided that CWA also gives them an advance reduction. CWA's procedure follows Supreme Court precedent and protects plaintiffs' interests sufficiently so that CWA's policy hardly can be labelled "arbitrary, discriminatory, or in bad faith." [8]

### B. CWA's Definition of "Chargeable Expenses".

■ Plaintiffs next argue that CWA defines its "chargeable expenses" too broadly. CWA's Policy on Agency Fee Objections

---

8. Plaintiffs similarly argue that the CWA collective bargaining agreement is unlawful because it states that all employees must pay CWA "amounts equal to the periodic dues applicable to members." Plaintiffs' Motion, Att. 1, General Agreement Article 4. Plaintiffs contend that CWA phrased this provision to intentionally mislead nonmembers into thinking that they had to pay full agency dues and had no right to object. Plaintiffs' Motion at 32. Plaintiffs also argue that this provision violates *Beck.*

The Court disagrees with plaintiffs. *Beck* did not address the appropriateness of a collective bargaining provision that authorizes the collection of full dues. *Beck,* as already discussed, addressed only the expenditure of dues on activities objected to by nonmembers.

Because the expenditure of the collected funds on nonchargeable activities is the harm involved, the Supreme Court repeatedly has held that these types of provisions are valid because they have only the collection of funds as their subject. The Court has so held even when it has simultaneously concluded that a union could not expend the collected funds on nonchargeable activities. The Court has done so precisely because these types of provisions only involve the collection of funds, which is not prohibited. *See Machinists v. Street,* 367 U.S. 740, 771, 81 S.Ct. 1784, 1801, 6 L.Ed.2d 1141 (1961) (injunction restraining enforcement of such a provision is not a remedy appropriate to the violation of restrictions on expenditures); *Railway Clerks v. Allen,* 373 U.S. 113, 120, 83 S.Ct. 1158, 1162–63, 10 L.Ed.2d 235 (1963) (same); *Ellis v. Railway Clerks,* 466 U.S. 435, 439, 104 S.Ct. 1883, 1887, 80 L.Ed.2d 428 (1984) (plaintiffs "do not contest the legality of the union shop [agreement], nor could they). For this reason, the court rejects this argument as well.

states that nonmembers must pay fees for "activities or projects undertaken by the Union to advance the employment-related interests of the employees it represents." Defendant's Exh. A ¶ 2. In March 1992, CWA further narrowed its chargeable activities to "those activities or projects normally or reasonably undertaken by the Union to represent the employees in its bargaining units with respect to their terms and conditions of employment." Defendant's Exh. T. Plaintiffs contend that CWA's policy violates *Beck* because in that case the Supreme Court defined chargeable expenditures as those related to "collective bargaining, contract administration, or grievance adjustment," 487 U.S. at 738, 108 S.Ct. at 2643–44, which plaintiffs contend is a significantly smaller category.

The definition of chargeable expenses is somewhat broader than plaintiffs would allow. *Beck* ultimately defined chargeable expenses as those "necessary to 'performing the duties of an exclusive representative of the employees dealing with the employer on labor-management issues.'" *Beck,* 487 U.S. at 762–63, 108 S.Ct. at 2657–58, *citing Ellis v. Railway Clerks,* 466 U.S. 435, 448, 104 S.Ct. 1883, 1892, 80 L.Ed.2d 428 (1984). *Beck* quoted *Ellis v. Railway Clerks* for that definition. In *Ellis v. Railway Clerks,* the Supreme Court elaborated on the above quoted language as including "not only the direct costs of negotiating and administering a collective-bargaining contract and of settling grievances and disputes, but also the expenses of activities or undertakings normally or reasonably employed to implement or effectuate the duties of the union as exclusive representatives of the employees in the bargaining unit." 466 U.S. at 448. CWA's definition of chargeable expenses falls within those expenses allowed under *Ellis* and *Beck.*

Plaintiffs also have failed to identify any of CWA's chargeable expenses as being in violation of any definition of chargeable expenses. In the Notice on Agency Fee Objections that

CWA publishes in *CWA News,* CWA lists a number of examples of chargeable and nonchargeable activities. As objectors, plaintiffs also have received a detailed multi-page list of chargeable and nonchargeable activities. Defendant's Motion, Beans Decl. ¶ 3, Exhs. G & U. Plaintiffs have challenged none of those charges listed as being improper. Because CWA's chargeable expenses fall within those expenses allowed by the Supreme Court and plaintiffs fail to object to any of those expenses, the court cannot conclude that CWA's definition of chargeable expenses is "arbitrary, discriminatory, or in bad faith."

C. CWA's Post–Objection Justification of Fees.

■ Plaintiffs next argue that CWA breaches its duty of fair representation by providing nonmembers detailed information about the propriety of the CWA fee only after nonmembers object to paying the full fee. Plaintiffs contend that CWA must provide nonmembers with background figures that justify the agency fee before the nonmembers must file their objections. The only basis plaintiffs have for this requirement is the *Hudson* case, which the court already has distinguished as inapposite when no state action is present.[9] Plaintiffs base this position, secondarily, on the case of *Abood v. Detroit Bd. of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), but that case also involved state action. Plaintiffs, in short, have no legal authority for this request.

CWA provides all the information that is necessary for a nonmember to determine whether or not he or she wants to object to payment of the full agency fee. CWA adequately fulfills its duty of fair representation when it provides each employee with a notice that includes: (1) a statement that members may object to their fees and receive an advance reduction payment, (2) examples of chargeable and nonchargeable expenses and

---

9. *Hudson,* if anything, supports CWA's position. In *Hudson,* nonmembers automatically paid a reduced fee without having to file an objection. 475 U.S. at 295, 106 S.Ct. at 1070. The only decision facing nonmembers was whether to challenge the amount of their fee reduction. To facilitate that decision, the Supreme Court stated

that the union had to provide detailed accounting information. That stage in *Hudson* is analogous not to the initial objection stage, at which plaintiffs request this information, but to the subsequent challenge/arbitration stage when CWA already provides this information.

an estimation of the approximate portion of CWA expenditures in each category, and (3) a promise that all objectors will be given a full explanation of the calculation of the fee reduction. *See* Defendant's Reply at 8. This information is sufficient to allow nonmembers to make an informed decision on whether they wish to object.

The detailed accounting that plaintiffs wish CWA to provide to all nonmembers simply is not necessary to a reasoned objection decision. That sort of information is necessary only to an objector's decision to challenge CWA's calculation of *non* chargeable expenses. Plaintiffs never tender an explanation of what additional information relevant to the objection decision an employee might glean from the detailed accounting information desired. The time and money CWA would have to expend to accede to plaintiffs' demand cannot be justified by the nonexistent benefit that would result.

Given CWA's extensive notification process and the dearth of applicable legal authority demonstrating the insufficiency of that process, the court concludes that CWA does not violate its duty of fair representation by failing to give nonmembers an explanation of CWA's *non* chargeable expenses before nonmembers file an objection to their payment of fees.

D. CWA's Requirement of Annual Objections During a Limited Time Period.

■ Plaintiffs' fourth argument is that CWA violates its duty of fair representation by requiring nonmembers to object to the agency fee each year and by limiting the objection period to just a few months. Plaintiffs rely on *Hudson* and *Railway Clerks v. Allen* for this position. The cases plaintiffs rely upon for this position are inapposite at best.

*Hudson* does not support plaintiffs' claim. If anything *Hudson* supports CWA's position that nonmembers have the obligation of making their objection known. *Hudson* 475 U.S. at 306, 106 S.Ct. at 1075–76. The footnote plaintiffs cite to in *Hudson, see* Plaintiffs' Motion at 22 n. 67, states that " '[d]issent is not to be presumed—it must affirmatively be made known to the union by the dissenting employee.' " 475 U.S. at 306 n. 16, 106 S.Ct. at 1076 n. 16 *citing Railway Clerks v. Allen,* 373 U.S. at 119, 83 S.Ct. at 1162. This statement suggests that CWA is within its rights to require annual objections.

In *Railway Clerks v. Allen,* the Supreme Court stated that by filing a complaint against the union the nonmembers sufficiently had made their objection known. 373 U.S. at 119 n. 6, 83 S.Ct. at 1162 n. 6. Plaintiffs also try to use this statement in support of their claim. In *Allen,* however, the union had not established an objection system and the filing of a legal action was the nonmembers only recourse. That factual distinction makes *Allen* unsupportive of plaintiffs' position.[10]

CWA's requirement that nonmembers repeat their objections every year during a specified time period provides an efficient yet fair system for objection. Because objection is not to be presumed, *Street* 367 U.S. at 774, 81 S.Ct. at 1802–03, CWA has a valid basis for requiring yearly objections. Nor can the objection period be never ending if CWA wishes to resolve nonmembers' disputes, tally its budget, and put the advance reduction process into motion.[11] CWA's procedure is not arbitrary but reasoned, and its basis in law shows the procedure also is not discriminatory or in bad faith. The court concludes that CWA's requirement of annual objections during a limited window period does not violate its duty of fair representation.

10. If anything, *Allen* supports CWA's requirement of repeated objections because there the Supreme Court concluded that those who filed the complaint had to repeat those objections through testimony if their objections were to survive to the end of the action. 373 U.S. at 119, 83 S.Ct. at 1162.

11. Plaintiffs claim that a six month statute of limitations period is applicable under *DelCostello v. Int'l Bhd. of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). That case concluded that a six month limitations period applied to breach of duty of fair representation claims. Nonmember objections do not constitute such claims and plaintiffs do not suggest why this limitation period should apply here.

E. CWA's Failure to Demonstrate that Chargeable Expenses Actually Benefit Plaintiffs.

■ Plaintiffs' fifth and final argument is that CWA has not shown that its chargeable activities work to the "actual benefit" of non-members. Plaintiffs contend that under *Beck*, CWA can "charge nonmembers only for those activities that actually benefit them." 487 U.S. at 760, 108 S.Ct. at 2556. Plaintiffs transform that statement into a requirement that CWA prove each charge actually benefits each nonmember. No such requirement can or should be inferred from *Beck*.

The Supreme Court defined chargeable activities in *Ellis* and *Beck, supra,* precisely so that unions like CWA could charge nonmembers for those activities without having to prove that those activities actually benefitted nonmembers. That is the purpose of the definition. Presumably, a union would only have to provide such proof if the charged activity did not fall within that definition or if nonmembers challenged the chargeability of an activity through an objection proceeding. That is not what plaintiffs request here. Plaintiffs want CWA to have to prove that all charged expenses, no matter how squarely those expenses fall with the Supreme Court's definition of chargeable ones, actually benefit them. There is no basis for such a requirement in Supreme Court precedent or in CWA's statutory duty of fair representation.

For the reasons stated above, the court rejects plaintiffs' broad-based attack on CWA's definition of "chargeable expenses." None of plaintiffs' arguments demonstrate that CWA's procedure for exacting agency fees from nonmembers violates CWA's fair duty of representation toward those employees. On these issues, plaintiffs' motion for summary judgment is denied and summary judgment for CWA is granted. The court next addresses plaintiffs' argument that CWA's method for computing their expenses violates CWA's duty of fair representation.

IV. *CWA'S COMPUTATION SCHEME.*

■ Plaintiffs' second basis of attack against CWA's procedure focuses on the computation scheme CWA uses to determine which of its expenses are chargeable and which are not. Plaintiffs contend that CWA uses a faulty and manipulable timekeeping scheme to apportion its staff salaries and costs between the chargeable and noncharge-able categories. The court disagrees with plaintiffs and rejects this argument.

As noted above, CWA allocates union expenditures into the chargeable and non-chargeable categories each year and bases its advance reduction payment to objecting fee payers on that allocation. The allocation is audited each year by independent certified public accountants, who issue a report on their audit. *See, e.g.,* Defendant's Exhs. H, K, Q, U, V, & W. These audits are conducted according to a format created by an expert in the field, now deceased, and are still reviewed annually by another expert. Beans Decl. ¶ 2.

CWA's expense allocation is in accord with the guidelines concerning allocations of expenditures contained in the audit guide issued by the American Institute of Certified Public Accountants (AICPA), "Audits of Certain Nonprofit Organizations," and in AICPA Statement of Position 78–10, "Accounting Principles and Reporting Practices for Certain Nonprofit Organizations." Beans Decl. ¶ 2. Accordingly, CWA's accountants have issued "unqualified" opinion letters stating that the reports present fairly the chargeable and nonchargeable expenses of CWA. Such an unqualified opinion is the strongest assurance given by a certified public accountant with respect to the reliability of a report. Beans Decl. ¶ 6.

Plaintiffs do not attack the credibility of the accounting reports. Instead plaintiffs challenge the numbers underlying the accounting reports. Plaintiffs attack the method CWA uses to allocate staff salaries and costs between its chargeable and noncharge-able accounts.

CWA retains a statistical firm to determine how much of CWA staff time and expenses (e.g. business trips, copying, etc.) goes toward chargeable versus noncharge-able activities. Westat, Inc. makes that determination by requiring CWA officers and staff to keep track of their time for one out of

every thirteen weeks. Defendant's Reply, DiGaetano Decl. ¶6. For those timekeeping weeks, Westat provides timekeeping forms to the employees. Those forms require the employees to record the amount of time they spend on any of twenty-four chargeable and nonchargeable activities. DiGaetano Decl. ¶3, Exh. BB. Westat uses the time sheets to determine how much time CWA staff spend on chargeable versus nonchargeable activities. CWA also uses the resulting proportions to allocate CWA expenses into the chargeable and nonchargeable categories.

Westat monitors the data collection process to determine the accuracy of the time reports by randomly calling employees during their time keeping week. DiGaetano Decl. ¶8. Westat requests the phoned employees to recount the activities of the previous day and to give time amounts for those activities. DiGaetano Decl. ¶8. Westat then compares that information with the time sheet the phoned employee turns in. DiGaetano Decl. ¶8. Over many years of data collection, Westat has found few reporting errors that result in a nonchargeable activity being classified as a chargeable one or vice versa. DiGaetano Decl. ¶8. Westat has also found no clear bias toward either over-reporting or under-reporting chargeable activities. DiGaetano Decl. ¶8.

Initially, Westat required CWA employees to keep track of their time one out of every four weeks. DiGaetano Decl. ¶4. Westat then extended the sampling cycle to thirteen weeks because the sampling error from the four week cycle demonstrated that changing to a less rigorous schedule would not result in an unacceptable increase in sampling error. DiGaetano Decl. ¶6. By increasing the reporting cycle Westat lowered the response burden on employees, which is a major cause of inaccuracy, as well as the cost to CWA. DiGaetano Decl. ¶4.

The change from four to thirteen week cycles did not affect the accuracy of the results. Westat estimates the confidence level of its results at 95%. DiGaetano Decl. ¶9. When Westat used four week cycles, its confidence level was 95% plus or minus 1%, with thirteen week cycles its confidence level

is still at 95% plus or minus 2%. DiGaetano Decl. ¶9.

■ CWA has to prove only by a preponderance of evidence that it appropriately allocates its staff salaries and expenses into the chargeable and nonchargeable categories. *Ellis v. Railway Clerks,* 466 U.S. at 467 n. 5, 104 S.Ct. at 1939. "Absolute precision in the calculation of [the] proportion is not ... to be expected, or required ... [because] of the difficult accounting problems that may arise." *Railway Clerks v. Allen,* 373 U.S. at 122, 83 S.Ct. at 1163–64. Westat's system and the accountant's review of Westat's figures provides sufficient basis for the court to conclude that CWA's computation system supports its figures with the preponderance of evidence available. The court also concludes that CWA's computation is not "arbitrary, discriminatory, or in bad faith."

Plaintiffs retained an expert, Dr. David Hawkins, to find fault with CWA's system and prevent this court from concluding that CWA's figures are supported by the preponderance of the evidence. Before the court even reaches the substance of Dr. Hawkins' report, however, the court must point out that Dr. Hawkins examined CWA's figures using the wrong standard of evidence.

Dr. Hawkins based his review of the CWA system on the clear and convincing standard of evidence as opposed to the preponderance of the evidence rule. Dr. Hawkins evaluated the CWA system "within the context of Special Master Wilson K. Barnes' Special Reports" to the trial court in *Beck v. CWA,* which Dr. Hawkins understands to establish what is legally required for CWA "to meet its burden of proof in regard to chargeable items." Plaintiffs' Motion, Attachment 3B, Hawkins Report at 1. The Fourth Circuit reversed the Special Master for applying a clear and convincing test, *Beck v. Communications Workers of America,* 776 F.2d 1187, 1209–10 (4th Cir.1985), in accord with the Supreme Court cases of *Ellis* and *Allen* quoted above.

Dr. Hawkins' use of the wrong evidentiary standard undermines the court's ability to use any of his conclusions, because Dr. Hawkins' criticisms assumed that CWA has to provide more evidence to support its deci-

sions than it in fact has to. The court never reaches this point, however, because the court concludes that Dr. Hawkins' criticisms of the CWA's system are unfounded.

Dr. Hawkins's single criticism of the Westat system is that it allows CWA employees to purposely skew their time keeping toward chargeable activities. Plaintiffs' Motion at 26. Dr. Hawkins believes all CWA employees necessarily cheat on their time sheets and that the Westat system does not provide adequate checks on that tendency. Hawkins Report at 8. That contention, supported only by Dr. Hawkins' allegation of CWA employees' inherent dishonesty, does not force the conclusion that CWA cannot justify its allocation of expenditures.[12]

This court will not assume that CWA employees are dishonest. There is no reason for the court to think so, and the court will not accept Dr. Hawkins' unsupported allegations in this respect. This is especially true when CWA has cautioned its employees specifically against skewing their time reports. Every CWA employee has either heard or received a copy of a statement from the CWA President cautioning them against biasing their time reports. DiGaetano Decl. ¶ 17, Exh. DD at 5. Westat also has checked its data for discrepancies that would result from biased reporting and has found no evidence of Dr. Hawkins' allegations. DiGaetano Decl. ¶¶ 12–17. Even if Dr. Hawkins' unfounded allegations are correct, these cautionary statements and checks guarantee the integrity of Westat's conclusions.

CWA has in place a detailed system that records and verifies the time and expenses its employees devote to chargeable and nonchargeable expenses. That system justifies by a preponderance of the evidence CWA's allocation of staff salaries and expenses into those categories. Its accounting reports double check and verify that allocation. Plaintiffs' fears of deceit do not undermine the court's confidence that this system is fair

and equitable, and not "arbitrary, discriminatory, or in bad faith." As to this claim then, the court denies plaintiffs' motion for summary judgment and grants summary judgment for CWA.

## V. CWA'S POLICY OF FORCED ARBITRATION.

■ Plaintiffs' last allegation against the CWA system is that it unlawfully forces nonmembers to resolve through arbitration their challenges to CWA's allocation of expenses. Plaintiffs contend that they should be able to bring these claims before the National Labor Relations Board or before a federal court. The court agrees with plaintiffs and finds that this provision in the CWA procedure violates CWA's duty of fair representation toward nonmembers.

The CWA Policy on Agency Fee Objections states that objectors who choose to challenge CWA's allocation of expenditures must do so through arbitration. Plaintiffs' Motion, Attachment 2, CWA Constitution at 26. That is the only avenue CWA provides objectors to challenge the CWA fee calculation. This requirement violates CWA's duty of fair representation even under the relatively lax standard this court must apply.

■ A party can be forced to arbitrate a grievance only if he or she has entered into a contract requiring that sort of dispute resolution. *Gateway Coal Co. v. United Mine Workers of America,* 414 U.S. 368, 374, 94 S.Ct. 629, 635, 38 L.Ed.2d 583 (1974). "No obligation to arbitrate a labor dispute arises solely by operation of law." *Id.* Plaintiffs contend and the court must agree that they have not entered into a contract to arbitrate their claims against the CWA.

"[W]hether a collective bargaining agreement creates a duty for the parties to arbitrate the particular grievance [ ] is undeniably an issue for judicial determination." *AT & T Technologies v. Communications Work-*

---

12. Plaintiffs and Dr. Hawkins attempt to muster support for their allegation of employee deceit by relying on the conviction of CWA vice president Martin Hughes for falsification of vouchers. As Dr. Hawkins admits, "one bad apple does not mean the whole barrel is rotten." Hawkins Report at 9. The *Hughes* case does not prove that the Westat system is flawed. Moreover, the falsifications involved in *Hughes* involved the false charging of funds between *chargeable* categories and not from chargeable to nonchargeable categories. If a broad-based reporting bias existed, the Westat verification process would have discovered it. *See infra* p. 30.

*ers of America,* 475 U.S. 643, 649, 106 S.Ct. 1415, 1418–19, 89 L.Ed.2d 648 (1986). Here the collective bargaining agreement, as far as the court can determine, does not even mention arbitration. That policy is only in the CWA Constitution. That document cannot bind plaintiffs, because plaintiffs are not members of the CWA. CWA may have the statutory authority to require nonmembers to pay agency fees, but that statutory authority cannot be extended to force nonmembers to follow CWA's choice of dispute resolution. CWA's statutory authority does not extend to that issue. CWA must get nonmembers' permission before it can refer fee disputes to arbitration.

 The court recognizes that there is a strong public policy preference for arbitration of labor disputes, but the rationale behind that policy does not support its application here. The presumption in favor of the arbitrability of labor disputes arises because arbitration usually " 'furthers the national labor policy of peaceful resolution of labor disputes and thus best accords with the parties' presumed objections in pursuing collective bargaining.' " *AT & T Technologies,* 475 U.S. at 650, 106 S.Ct. at 1419, *citing Schneider Moving & Storage Co. v. Robbins,* 466 U.S. 364, 371–72, 104 S.Ct. 1844, 1848–49, 80 L.Ed.2d 366 (1984) (citation omitted). As is readily apparent from this rationale, it justifies only the forced arbitration of collective bargaining disputes between unions and employers. This justification is hardly applicable when the dispute is between a union and a nonmember and labor unrest is not threatened. Given the inapplicability of this policy interest here, the court cannot rely on it to override the otherwise inviolable principle that parties cannot be force to arbitrate a grievance if they have not previously agreed to do so.

CWA is surprisingly silent in the face of plaintiffs' contention that the arbitration clause violates CWA's duty of fair representation. The arbitration requirement is an arbitrary forum choice and it discriminatorily violates the rights of plaintiffs, who do not wish to resolve their disputes through arbitration. The court cannot overlook this requirement even under the "wide range of

reasonableness" standard. The Supreme Court has made clear that forced arbitration is unlawful and unreasonable. CWA's policy in this regard cannot stand. On the arbitration issue, the court grants summary judgment for plaintiffs and denies summary judgment for defendant.

## VI. *CONCLUSION.*

For the reasons stated, the court upholds CWA's policy and procedure for agency fee objections except as to that provision in the policy that limits to arbitration the way in which plaintiffs can challenge CWA's expense allocation. The arbitration provision of CWA's policy violates CWA's duty of fair representation to plaintiffs.