Anthony D. LUTZ, Janet Cope, Donna M. Courain, Shareon S. Montague, Cara A.L. Behrens, Wendell L. Choo, and all others similarly situated. Plaintiffs,

v.

INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, Defendant.

No. C.A. 00–148–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 22, 2000.

---

Raymond J. LaJeunesse, Jr., c/o National Right to Work, Legal Defense Foundation, Inc., Springfield, VA, for Plaintiffs.

Susan Rebbeca Podolsky, Jenner & Block, Washington, DC, for Defendant.

### MEMORANDUM OPINION

ELLIS, District Judge.

This is a class action brought against the International Association of Machinists and Aerospace Workers ("IAM") by airline employees who are nonunion members but who are nonetheless represented by the IAM for collective bargaining purposes, as required by the Railway Labor Act ("RLA").[1] These employees, as permitted by law,[2] object to paying the union any fees or dues that are unrelated to the costs of collective bargaining.[3] At issue on the parties' cross-motions for summary judgment is whether the IAM, consistent with the RLA and the First Amendment, may refuse to allow nonmembers of the union to file a continuing objection to the payment of union dues unrelated to the costs

---

1. *See* 45 U.S.C. §§ 151 *et seq.*

2. *See Railway Clerks v. Allen*, 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963).

3. For clarity, the term "dues" is used to refer to the money union members pay the union, while the term "fees" is used to refer to the money nonmembers pay to the union. And the term "fee surcharge" refers to the difference between the total fee and the portion of that fee that covers the costs of collective bargaining.

of collective bargaining and require them instead to file an annual objection.

## I

The material facts are not disputed. The named plaintiffs are all employees of United Airlines who, although not members of the union, are nonetheless represented by the IAM for collective bargaining purposes under the RLA. They represent a certified class of plaintiffs that includes all nonmembers of the IAM employed by carriers within the meaning of Section 1 or Section 201 of the RLA, 45 U.S.C. §§ 151, 181, who are subject to collective bargaining agreements under the RLA that require the nonmembers to pay dues or fees to the IAM as a condition of employment. *See Lutz v. IAM*, 196 F.R.D. 447, 2000 WL 1528292 (E.D.Va. Oct.12, 2000) (*"Lutz I"*).

The IAM is the exclusive bargaining representative of approximately 141,500 employees of various railway and airline carriers covered by the RLA. Of this number, approximately 140,000 are members of the IAM, while 1,039 are nonmembers. IAM members pay dues to the union in an amount calculated to defray the costs of collective bargaining plus an additional amount to fund union expressive or political activities. Nonmembers, pursuant to law and various collective bargaining agreements,[4] must pay the IAM a fee equal to the full amount of dues paid by members, unless a nonmember objects, in which event the objecting nonmember need only pay the IAM a fee that covers the nonmember's pro-rata share of the collective bargaining costs. An objecting

nonmember is not required to pay the IAM the fee surcharge, namely the difference between the full fee or dues amount and the nonmember's pro-rata share of collective bargaining costs. Nonmembers who wish to object to paying the fee surcharge must comply with the IAM's established procedures for this purpose. Specifically, objecting nonmembers must submit their objections *annually* during the month of November. Continuing objections are not permitted. Thus, if a nonmember submits an objection in November, he or she will be required to pay only a fee to cover the costs of collective bargaining, but not the fee surcharge. And, this will continue to be true for subsequent years provided the nonmember submits a timely objection each subsequent November. Failure to do so will result in the objection lapsing and the nonmember being assessed the full fee amount, including the fee surcharge.

The central feature of the IAM's objection procedure is the requirement of an annual submission asserting the objection. In this regard, the IAM publishes annually a "Notice to Employees Subject to Union Security Clauses" ("Notice"). This is a quarterly publication distributed via mail and the IAM's website to all employees the IAM represents. The Notice explains the procedure nonmembers must follow to object to the collection of the fee surcharge and thereby pay a reduced union fee in the next calendar year. In addition, the Notice informs the employees of the amount of the fee surcharge. This amount varies from year to year.

---

4. Article XXV of the collective bargaining agreement (the "Union Security" provision) between United and the IAM establishes the terms and conditions for the "Passenger Service Employees" craft, of which the named plaintiffs are members. Through this provision, which is essentially a union shop provision, the IAM requires all employees to pay agency fees as a condition of employment. The Union Security provision provides, in pertinent part:

A. Any employee in a classification covered by this Agreement on the effective date of this Article shall become a member of the Union within sixty (60) days after the effective date of this Article and shall be required as a condition of continued employment by the Company to maintain their membership in the Union so long as this Article remains in effect, to the extent of paying an initiation (or reinstatement) fee and monthly membership dues no greater than as hereinafter set.

In June 1999, all of the named plaintiffs submitted timely objections to the payment of the fee surcharge. All but one of the named plaintiffs stated in their submissions to the IAM that their objections were continuing in nature and thus applicable to all subsequent years. The IAM rejected these continuing objections because they were contrary to the IAM's policy requiring annual objections from nonmembers who did not wish to pay the fee surcharge. Thus, these named plaintiffs were required to pay the fee surcharge in November 2000. The remaining named plaintiff filed only a standard objection that did not include notice that it was a continuing objection. In November 1999, however, when this named plaintiff filed her next annual objection, she included a statement that her objection was continuing in nature and applicable to all subsequent years. This attempt to assert a continuing objection met the same fate as did the continuing objections submitted by the other named plaintiffs: The IAM rejected it as contrary to the union's policy.

In August 2000, plaintiffs filed a motion to have a class certified of "all nonmembers of Defendant IAM, including new employees, employed by carriers within the meaning of Section 1 or Section 201 of the RLA, 45 U.S.C. §§ 151, 181, who are subject to collective bargaining agreements under the RLA that require nonmembers to pay dues or fees to the IAM as a condition of employment." In October 2000, the proposed class was certified. *See Lutz I.* The class includes all non-IAM members who are represented by the IAM under the RLA. This group numbers approximately 1,039. Of this number, approximately 315 nonmembers have filed objections to the payment of the fee surcharge during the year 2000.[5] Of that number, roughly 26 nonmembers labeled their objections as continuing and applicable to subsequent years.

At issue now are the parties' cross-motions for summary judgment.[6]

## II

This fee surcharge objection dispute is only the latest skirmish in the longstanding struggle between the forces represented by the parties at bar: organized labor and the right-to-work 'movement.[7] Given this, a brief summary of the history of the nonmember fee surcharge litigation is a useful preface to the issues presented. This history may be said to begin with the 1934 amendments to the RLA which, *inter alia,* mandated that the union selected by a majority of the employees in the bargaining unit serve as the exclusive bargaining agent of all the unit employees, including those who elect not to join the union. *See* 45 U.S.C. § 152, Ninth. This grant of exclusive representative status to the unions gave rise to a concern that unions deal fairly with nonunion members, as well as members. To address this concern and ensure that unions fairly and adequately represent all unit employees, including non-union members, the Supreme Court imposed on unions a judicially created duty of fair representation ("DFR"). *See Steele v. Louisville & Nashville R.R.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944).[8] Concern about the non-

---

5. The number of objecting nonmembers varies annually. Of the 315 objecting nonmembers for calendar year 2000, approximately 167 had also filed timely objections for calendar year 1999.

6. Summary judgment is appropriate at this stage, for the parties agree that no material facts are disputed. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

7. The named Plaintiffs are represented by attorneys provided by the National Right to Work Legal Defense Foundation, Inc.

8. In *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), the Supreme Court held that a union violates the duty of fair representation when its actions are "arbitrary, discriminatory, or in bad faith." *Id.* at 190, 87 S.Ct. 903.

members was not the only problem created by the RLA's grant to the union of exclusive representative status. The requirement that the union, as the exclusive bargaining representative, represent all employees in the bargaining unit, including non-union members, coupled with the fact that non-union members paid no union dues, gave rise to a "free-rider" problem. Specifically, unions were required to negotiate on behalf of nonmembers, as well as members, who paid no dues, receiving this benefit free of charge. In this respect, nonmembers were free-riders. To remedy this, Congress, in 1951, enacted Section 2, Eleventh of the RLA, which confers on unions the authority to enter into collective bargaining agreements requiring all employees in the represented bargaining units either to join the union or, alternatively, to pay fees equal to dues. While this provision solved the free-rider problem, it spawned a new problem of constitutional dimensions: A serious First Amendment concern attached to the fact that unions could now use, for political purposes with which nonmembers disagreed, the portion of the non-union members' fees that exceeded collective bargaining costs. The Supreme Court then addressed this concern, ruling in a series of cases that the RLA does not permit unions to use a nonmember's fees for political causes if the employee affirmatively makes his objection known. *See, e.g., Street,* 367 U.S. at 774, 81 S.Ct. 1784.

Following these decisions, litigation between these factions has focused on aspects of the objection procedure, including,

for example, which expenses should be included in the fee surcharge,[9] the form and substance of the notice given to nonmembers,[10] the procedures by which the fee surcharge was collected,[11] and the specificity with which the objection must be made.[12] Particularly pertinent here is that four courts have addressed the lawfulness of a union's annual objection requirement. Three courts—the D.C. Circuit, the Sixth Circuit, and a Maryland district court—upheld the annual objection requirement under the DFR standard.[13] The fourth court, the Fifth Circuit, reached the contrary result, finding first that the applicable standard is found in the First Amendment, not the DFR, and then that the annual objection requirement fails under that standard. *See Shea v. IAM,* 154 F.3d 508 (5th Cir.1998). Significantly, *Shea* involved not only the precise question here in issue, but also the same union.[14] Thus, a threshold question is whether the IAM is collaterally estopped by *Shea* from relitigating the same issue here.

### III

The doctrine of collateral estoppel, or issue preclusion, derives from the principle that "later courts should honor the first actual decision of a matter that has been actually litigated." *Burlington N.R.R. Co. v. Hyundai Merchant Marine Co.,* 63 F.3d 1227, 1231 (3d Cir.1995) (quoting Charles A. Wright et al., Federal Practice & Procedure § 4416 (1981)). Collateral estoppel relieves the parties of the cost of relitigating questions of fact or law that are identi-

9. *See Ellis v. Brotherhood of Ry., Airline, and Steamship Clerks,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984).

10. *See Chicago Teachers Union v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986); *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977)

11. *See id.*

12. *See Railway Clerks v. Allen,* 373 U.S. 113, 118–19, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963).

13. *See Abrams v. Communications Workers of Am.,* 59 F.3d 1373 (D.C.Cir.1995); *Tierney v. City of Toledo,* 824 F.2d 1497 (6th Cir.1987); *Kidwell v. Transportation Communications Int'l Union,* 731 F.Supp. 192 (D.Md.1990).

14. *Shea* was not a class action, and for reasons that do not appear in the record, the IAM elected not to appeal the Fifth Circuit's decision.

cal to issues already decided. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Furthermore, the doctrine conserves valuable judicial resources and avoids inconsistent rulings. *See Parklane Hosiery*, 439 U.S. at 326, 99 S.Ct. 645. Thus, plaintiffs here invoke federal estoppel rules[15] to use the *Shea* decision as a bar to the relitigation of the constitutionality of the annual objection procedure—the issue the IAM unsuccessfully litigated in the Fifth Circuit.

■ Collateral estoppel analysis begins with the application of the five-prong test established in *Polk v. Montgomery County*, 782 F.2d 1196 (4th Cir.1986). This test requires the party seeking estoppel to establish:

(1) The party against whom the estoppel is asserted [was] . . . a party or in privity with the party in the prior action;

(2) There [was] . . . a final determination of the merits of the issues to be collaterally estopped;

(3) The issues decided in the prior action [were] . . . necessary, material, and essential to the prior case;

(4) The party against whom the estoppel is to be applied . . . had a full and fair opportunity to litigate the issues;

(5) The issues in the prior litigation [are] . . . identical to the issues sought to be estopped.

*Polk*, 782 F.2d at 1201.

The parties do not dispute that these factors have been met. First, the IAM was the defendant in the *Shea* action. Second, the Fifth Circuit's decision is final as the IAM did not appeal the matter to the Supreme Court. Third, the annual objection determination in *Shea* was necessary and essential to the resolution of that matter as it was the basis of the lawsuit. Fourth, there is no substantial dispute that the IAM had a full and fair opportunity to litigate the matters. Finally, the issue addressed in *Shea*—that is, the validity of the IAM's annual objection requirement—is identical to the issue presented here. Accordingly, plaintiffs satisfy the *Polk* five-prong test for the application of collateral estoppel.

■ But the analysis does not end here. It is important to note that the plaintiffs here invoke offensive, non-mutual collateral estoppel. This form of estoppel occurs when a "plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against the same or a different party." *United States v. Mendoza*, 464 U.S. 154, 159, 104 S.Ct. 568, 78 L.Ed.2d 379 n.4 (1984).[16] Offensive collateral estoppel does not automatically result when the *Polk* test is met; rather, the Supreme Court and the Fourth Circuit have stated that the doctrine should be used conservatively and should not be applied when its application would be unfair. *See Parklane Hosiery*, 439 U.S. at 331, 99 S.Ct. 645; *Sales v. Grant*, 158 F.3d 768, 780 (4th Cir.1998). Offensive collateral estoppel may result in unfairness to a defendant because its application creates an incentive for individuals to refrain from joining the initial action. *See Parklane Hosiery*, 439 U.S. at 331, 99 S.Ct. 645. This point is illustrated by the familiar example of the accident with multiple vic-

---

**15.** Federal collateral estoppel rules apply because this is a federal question case and the issue is whether to give preclusive effect to a prior federal judgment. *See Burlington*, 63 F.3d at 1231; *compare McCurry*, 449 U.S. at 95–96, 101 S.Ct. 411 (holding that federal courts should apply collateral estoppel as it would be applied in the state where the initial state judgment was rendered).

**16.** It is non-mutual estoppel because the plaintiffs were not parties to the *Shea* decision. The absence of mutuality is no bar to an estoppel, as the Supreme Court eliminated the mutuality requirement in the application of collateral estoppel rules. *See McCurry*, 449 U.S. at 94–95, 101 S.Ct. 411.

tims. In this setting, claimants are not estopped from suing a defendant even were defendant to prevail against the first claims. Thus, they have an incentive to wait until the first victory by a claimant and then sue, claiming estoppel. *See id.* at 331 n. 14, 99 S.Ct. 645. Because offensive use of collateral estoppel may often "increase rather than decrease the total amount of litigation" and may also result in inconsistent rulings, "the preferable approach for dealing with [offensive collateral estoppel] in federal courts is not to preclude [its] use ..., but to *grant trial courts broad discretion to determine when it should be applied.*" *Id.* at 330, 99 S.Ct. 645 (emphasis added). And, the exercise of this discretion should be guided by a consideration of the following factors: (i) whether the plaintiff could easily have joined in the first matter, (ii) whether the defendant had the incentive to litigate vigorously the first action, (iii) whether the judgment relied on is inconsistent with one or more previous judgments, and (iv) whether additional procedural opportunities are available to the defendant in the subsequent action. *See id.* at 330–32, 99 S.Ct. 645; *C.B. Marchant Co., Inc. v. Eastern Foods, Inc.,* 756 F.2d 317, 319 (4th Cir.1985). In general, "[t]he appropriateness of collateral estoppel depends upon the particular realities in each case." *Chicago Truck Drivers v. Century Motor Freight, Inc.,* 125 F.3d 526, 532 (7th Cir. 1997).

■ These principles, applied here, point persuasively to the conclusion that *Shea* should not be given collateral estoppel effect; to conclude otherwise raises concerns of fairness and consistency. This is evident from the following: First, the legal issue presented is quite unsettled; there is a conflict among the circuits on the validity of the annual objection requirement, and the Fourth Circuit has yet to address the issue. And, importantly, the annual objection procedure "involves a unique determination of law, and one of general application." *Chicago Truck Driv-*

*ers,* 125 F.3d at 532. Given this, the application of collateral estoppel in this context may lead to anomalous results. Specifically, were *Shea* to be given collateral estoppel effect, only the IAM, but not other unions operating within this circuit, would be precluded from requiring annual objections. The Seventh Circuit, in similar circumstances, refused to apply collateral estoppel, noting that "though we would be free in a future case to determine that [the law] is valid ..., that determination would apply to everyone but [the defendant].... [S]uch inconsistency in treatment is a concern." *Id.* at 532. Collateral estoppel should not apply here for the same reasons.

Plaintiffs argue that inconsistency concerns are irrelevant because the IAM was not a party to the actions upholding the annual objection procedure, and, therefore, there are no inconsistent rulings against the IAM. This argument is unpersuasive; it is not dispositive that the application of collateral estoppel here would not produce inconsistent rulings as to the IAM. The concern extends to all unions covered by the RLA. As noted, were collateral estoppel to apply here, unions in this circuit might operate under different rules, as only the IAM would be bound by *Shea,* and the Fourth Circuit may reach a different result as to other unions. In short, the application of collateral estoppel in this case would "substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue." *Mendoza,* 464 U.S. at 159, 104 S.Ct. 568. In sum, substantial concerns of fairness and the risk of inconsistent rulings counsel against exercising the discretionary authority to apply offensive, collateral estoppel in this case.

**IV**

The threshold merits determination is whether the annual objection procedure is subject to scrutiny under the First Amendment or the DFR. This is not an inconsequential determination as scrutiny under the First Amendment is significantly more

rigorous and less deferential than DFR review.[17]

■ Analysis of a First Amendment claim properly begins with a determination whether state action is implicated. Put in terms of this case, the threshold question is whether state action can be found in the IAM's imposition of an annual objection requirement. The answer to this question lies in the recognition that state action, *i.e.*, the RLA, is the source of the IAM's authority to impose a fee on nonmembers. This form of state action was found to support a First Amendment right to object to the fee surcharge. *See Railway Employees Dep't v. Hanson*, 351 U.S. 225, 232, 76 S.Ct. 714, 100 L.Ed. 1112 (1956). As the *Shea* court put it, "there is sufficient state action to implicate the First Amendment ... because ... federal law is the authority through which private rights are lost." *Shea*, 154 F.3d at 513 n. 2; *see also Hanson*, 351 U.S. at 232, 76 S.Ct. 714 ("If private rights are being invaded, it is by force of an agreement made pursuant to federal law."). So, just as it is clear that state action warrants a First Amendment right to object to the fee surcharge, so too does state action warrant First Amendment scrutiny of the procedures for asserting the objection. This is so because these procedures have the potential for abridging the First Amendment objection right. As the Supreme Court in *Abood v. Detroit*

*Bd. of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) recognized, "the Union should not be permitted to exact a service fee from nonmembers without first establishing a procedure which will avoid the risk that their funds will be used, even temporarily, to finance ideological activities unrelated to collective bargaining." *Id.* at 244, 97 S.Ct. 1782 (Stevens, J. concurring). Thus, First Amendment scrutiny applies because the substantive right and the procedures associated with that right may "effectively charge[ ] the employees for activities that are outside the scope of statutory authorization." *Ellis v. Bhd. of Ry., Airline, and Steamship Clerks*, 466 U.S. 435, 444, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984).[18]

To be sure, unions are typically considered private entities.[19] Yet, contrary to the IAM's contention, the result reached here does not convert the IAM to a state actor for all purposes. Much union activity remains private and does not implicate state action or the First Amendment. As the Fourth Circuit has put it, the "mere fact of regulation of some aspects of the union's duties under the RLA does not give rise to state action [over all aspects of the union's activities]."[20] IAM state action exists only where the union procedure in issue derives from the statutory grant of power to the union to compel nonmembers to contribute fees subject to the nonmem-

17. To succeed on its claim of a violation of the DFR, plaintiffs must show that the requirement is so far outside a "wide range of reasonableness ... as to be irrational." *Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991) (internal quotation omitted); *Vaca v. Sipes*, 386 U.S. 171, 191, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) (holding that to prevail on DFR claim, one must show requirement is "arbitrary, discriminatory, or in bad faith").

18. In *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), the Supreme Court held that procedures affecting the right to object should be "carefully tailored" to (i) minimize the infringement on First Amendment freedoms and (ii) provide nonmembers a fair opportunity to identify and challenge the constitutional-

ity of the governmental action. These procedures go to the "core" of the right to object. *See id.* at 303, 106 S.Ct. 1066.

19. *See, e.g., Hovan v. United Bhd. of Carpenters and Joiners of Am.*, 704 F.2d 641, 642 (1st Cir.1983).

20. *Kidwell v. Transportation Communications Int'l Union*, 946 F.2d 283, 298 (4th Cir.1991); *see also United Steelworkers of Am. v. Sadlowski*, 457 U.S. 102, 121 n. 16, 102 S.Ct. 2339, 72 L.Ed.2d 707 (1982) (holding that "union's decision to adopt an [internal] rule does not involve state action"); *Hovan*, 704 F.2d at 644 (rejecting employee's claim that "government action follows automatically from the fact that the NLRA vests the union with exclusive authority to bargain with [the employee's] employer").

bers' right to object to the fee surcharge. The union remains free to determine, for example, the requirements for membership in the union or whether to "support . . . a local political candidate or the design for the union's softball team uniforms." *Kidwell v. Transportation Communications Int'l Union,* 946 F.2d 283, 298 (4th Cir.1991).

The remaining question, then, is the appropriate level of First Amendment scrutiny applicable to the annual objection procedure. Neither the Supreme Court nor any lower court has specifically addressed whether the union's annual objection procedures are subject to strict scrutiny,[21] time-place-manner analysis,[22] or, some intermediate level of scrutiny.[23] Instead, the best guidance available is the Supreme Court's statement in *Chicago Teachers Union v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), that the "First Amendment requires that the [fee surcharge objection] procedure be *carefully tailored to minimize the infringement*" on the nonmembers' constitutional rights. *Id.* at 303, 106 S.Ct. 1066 (emphasis added). Because the collection of fees from nonmembers impacts First Amendment interests, the Supreme Court has further stated that "the [union's] objective must be to devise a way of preventing compulsory subsidization of ideological activity by employees who object thereto without restricting [its] ability to require every employee to contribute to the cost of collective bargaining activities." *Abood,* 431 U.S. at 237, 97 S.Ct. 1782.

■ The IAM annual objection requirement fails to pass muster under either *Hudson*'s "carefully tailored" standard, or indeed under any of the three traditional standards. This is so because the annual objection requirement imposes a burden on the First Amendment rights of nonmembers, and, yet, the IAM has not offered *any* legitimate reason for such a requirement.[24] Instead, the IAM has offered only that the requirement is rational because the union determines anew, annually, the amount of the fee surcharge, and, therefore, nonmembers should be required to rethink their objection to the payment of the fee surcharge on an annual basis. This justification does not support the denial of a continuing objection because it is based not on any legitimate need of the IAM, but rather on a supposed benefit to objecting nonmembers. As the union conceded at oral argument, what is really at stake here is whether the union can collect more money as a benefit of the decisionmaker's inertia. In other words, it is the IAM's hope that objecting nonmembers will either forget or overlook the annual objection requirement, or will reconsider their objection on the merits, thereby enabling the IAM to collect greater funds from nonmembers. This hope is no justification for the union's imposition of an objection procedure that burdens First Amendment rights.

The IAM's contrary arguments are unpersuasive. Thus, the IAM's reliance on cases upholding the imposition of 30–day periods during which objections to fees must be made is misplaced. *See Andrews v. Education Assoc. of Cheshire,* 829 F.2d 335, 340 (2d Cir.1987); *Kidwell,* 731 F.Supp. at 204. At best, these cases support the proposition that it is reasonable for a union to require all objections to be filed within an administratively convenient period, not that an annual objection requirement is justifiable. Indeed, if First Amendment scrutiny were applied

---

**21.** *See Roberts v. U.S. Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984).

**22.** *See Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

**23.** *See 44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996).

**24.** Plaintiffs' citation to *Tavernor v. Illinois Fed'n of Teachers,* 226 F.3d 842, 849 (7th Cir.2000) in support of the burden argument is not squarely on point. *Tavernor* struck down a procedure for objecting to the amount of the fee surcharge; it did not address whether the annual objection requirement, by itself, was burdensome.

to the 30–day period, the requirement would likely survive intermediate or time-place-manner analysis, as the union can assert a legitimate, content-neutral interest to justify the procedure.[25]  *See, e.g., Ward v. Rock Against Racism,* 491 U.S. 781, 798, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (time, place, or manner regulations must be narrowly tailored to serve the government's legitimate, content-neutral interests).  No such justification has been offered to support the annual objection requirement, and thus, the requirement fails under any First Amendment standard.

In the course of oral argument, the IAM argued further that the annual objection requirement abridges no First Amendment rights as it is indistinguishable from procedural rules that require those who wish to exercise their right to vote to cast their ballots only on election day, or that require those who seek to file suit in the courts—or to obtain parade permits, for that matter—to meet filing deadlines.  All of these requirements, however, have constitutionally permissible justifications and are, therefore, distinguishable.  These examples, moreover, are inapt; they—like the 30–day–window cases—involve content-neutral administrative conditions on the exercise of one's constitutional rights, where failure to satisfy those conditions only result in a return to a *status quo ante* that does not involve an affirmative infringement of First Amendment rights.

Here, however, the IAM's refusal to honor continuing objections imposes an unjustifiable barrier for nonmembers seeking to maintain a *status quo ante* of objecting nonmembership, and instead has, as a default, the unconstitutional exaction of fees.  Thus, the proper analogy is not one offered by the IAM; rather, the annual objection procedure is more closely analogous to a governmental pronouncement that a citizen who fails to cast a ballot on election day will be considered to have voted for a previously designated "default" candidate.  The law does not permit such an imposition of an unconstitutional default.  Similarly, in the case at bar, the failure of a nonmember to file an annual objection should not result in an unconstitutional exaction of fees.[26]

In sum, the annual objection requirement fails First Amendment scrutiny because the requirement is without a valid justification and imposes an undue burden that creates a risk that funds "will be used . . . to finance ideological activities unrelated to collective bargaining."  *Hudson,* 475 U.S. at 305, 106 S.Ct. 1066.[27]  Accordingly, because the procedure is in violation of the nonmembers' First Amendment rights, summary judgment should be granted in favor of the plaintiffs.

An appropriate order will issue.

Where constitutional rights are at stake, society should be reluctant to require compliance with arbitrary rules to which individuals have not agreed to be bound.

25.  Similarly, an IAM requirement that nonmembers seeking to change the status of a continuing objection do so only within a 30–day period would also likely pass First Amendment muster.

26.  The IAM's analogies also ignore the distinction between members and nonmembers.  The IAM's examples involve United States citizens—members (of sorts) who have agreed to be governed by the laws, procedures, and rules of the United States government.  Citizens, *i.e.,* members, have "agreed" to voting dates as well as to lawsuit and parade filing deadlines.  By contrast, the nonmembers here have affirmatively chosen, as is their right, not to join the union; they have not agreed to an annual objection procedure.

27.  The IAM also argues that the annual objection requirement is justified because the Supreme Court placed the burden of objecting on the employee.  *See Street,* 367 U.S. 740, 81 S.Ct. 1784.  This argument fails because there is an important difference between placing the burden of objecting on an employee and imposing yet a further restriction that makes the burden onerous.  An employee's burden to make an affirmative objection may easily be satisfied through submission of a continuing objection.